CULEBRA ENTERPRISES CORP. ET AL., demandantes y apelantes,
 v. ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y
 apelado.

*Número:* AP-95-1 *Resuelto:* 31 de octubre de 1997

*Miguel P. Cancio Bigas,* de *Sánchez, Betances & Sifre,* abogado de la parte apelante; *Carlos Lugo Fiol, Procurador General, Jacqueline Novas Debién, Subprocuradora General, Roxanna Badillo Rodríguez* y *Edgardo Rodríguez Quilichini, Procuradores Generales Auxiliares,* abogados del Estado Libre Asociado de Puerto Rico, apelado.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

 Examinamos la justeza de la compensación(¹) concedida a *Culebra Enterprises Corp. et. al.,* propietarios de unos terrenos en la Isla Municipio de Culebra, por la pérdida del valor de uso durante la vigencia de cierta regla-

---

(¹) El Art. II, Sec. 7 de la Carta de Derechos de nuestra Constitución, L.P.R.A., Tomo 1, consagra el derecho fundamental del ser humano al disfrute de la propiedad. En lo pertinente, el Art. II, Sec. 9 de nuestra Constitución dispone, en lo pertinente, que "[n]o se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una *justa compensación* y de acuerdo con la forma provista por ley". (Énfasis suplido.) Const. E.L.A., *supra,* ed. 1982, pág. 296.

Su génesis es la Quinta Enmienda de la Constitución federal, dispositiva de que "[no] se podrá tomar propiedad privada para uso público, sin justa compensación". Emda. V, Const. EE. UU., L.P.R.A., Tomo 1, ed. 1982, pág. 188. Véase Nota, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment,* 94 Yale L.J. 694 (1985).

mentación gubernamental que *limitó temporalmente sus usos*.

## I

Entre 1966 a 1974, las entidades Culebra Enterprises, Corp.; Vango, Inc.; Navgo, Inc. y Govan, Inc. adquirieron aproximadamente cuatrocientas seis (406)([2]) cuerdas en la Isla Municipio de Culebra para segregarlas y venderlas en fincas de cinco (5) cuerdas. *El propósito era que sus adquirentes construyesen una (1) unidad de vivienda para uso vacacional.* El esquema reglamentario vigente de la Junta de Planificación (en adelante la Junta) *así lo permitía.* El 30 de noviembre de 1974 se enmendaron los Arts. 3 y 5 del Reglamento de Planificación Núm. 3, Junta de Planificación de Puerto Rico, 2da rev., Santurce, 1959, págs. 5–6, y aumentó a veinticinco (25) cuerdas el mínimo segregable. Al aprobarse estas enmiendas, Culebra Enterprises Corp. *et al.* habían segregado sus propiedades en lotes de cinco (5) cuerdas para fines agrícolas.([3])

Después de haber salido de Culebra la Marina de Guerra de Estados Unidos, se inició un proceso ordenado de planificación del Municipio. La Junta, al amparo de la facultad conferida por la Ley Núm. 75 de 24 de junio de 1975 (23 L.P.R.A. sec. 1 *et seq.*), *enmendó* el Plan de Usos de Culebra y reglamentó extensamente el desarrollo de sus

---

([2]) Se distribuían de la manera siguiente:

Culebra Enterprises 245.6718 cuerdas; Navgo, Inc. 72.3302 cuerdas; Vango, Inc. 55.87 cuerdas, y Govan, Inc. 31.991 cuerdas de terreno.

([3]) Según surge de la Escritura Núm. 22 sobre segregación, otorgada por Culebra Enterprises, Corp. ante el notario Juan Agustín Rivera, Culebra Enterprises, Corp. segregó cuarenta y un (41) parcelas; Vango, Inc. diez (10) parcelas; Navgo, Inc. catorce (14) parcelas y Govan, Inc. seis (6) parcelas. Cada parcela tenía una cabida aproximada de cinco (5) cuerdas y el propósito era revenderlas.

La segregación de estos terrenos se efectuó al amparo del Reglamento de Planificación Núm. 3, Junta de Planificación de Puerto Rico, 2da rev., Santurce, 1959, cuyos Arts. 3 y 5, págs. 5–6, establecían un mecanismo de dispensa especial para terrenos ubicados en la zona rural. Conforme a ello, cuando de la Declaración de Intención de Lotificar (Art. 4 del citado Reglamento, pág. 6) se deducía que se trataba de una lotificación para fines agrícolas, se activaba un sistema de desvío, de carácter expedito, que obviaba el trámite ordinario para obtener la aprobación.

terrenos. En 1975 declaró a Culebra "caso especial" y aprobaron las Resoluciones Núms. JP-215, JP-215-A y Z-79. Como consecuencia, los terrenos de Culebra Enterprises Corp. *et al.* fueron clasificados como distritos "P" y "RO-25-C". Esta nueva reglamentación entró en vigor el *13 de agosto de 1975.*

Esta *primera* clasificación "P" reservaba de forma exclusiva los terrenos zonificados de esta manera para gestiones y usos públicos. Un total de doscientas ocho (208) cuerdas de terrenos, propiedad de las demandantes, fueron así clasificadas y afectadas.[4]

La *segunda* clasificación, "RO-25-C" —baja densidad poblacional y uso agrícola —requería que las segregaciones tuvieran una cabida mínima de veinticinco (25) cuerdas y una sola residencia para usos relacionados con actividades agrícolas. Al balance de terrenos que eran propiedad de las corporaciones, o sea, ciento noventa y ocho (198) cuerdas,[5] se les impuso esta zonificación. *Como resultado se detuvo el proyecto de desarrollo del complejo de residencias veraniegas.*

Por tal razón, en noviembre de 1977, Culebra Enterprises Corp. *et al.* solicitaron a la Junta que les permitiesen segregar y vender los solares con la cabida de cinco (5) cuerdas. Adujeron tener derecho por haberse verificado esas segregaciones *antes* de la aprobación de los nuevos reglamentos. Esta solicitud fue denegada. Igual suerte tuvo la reconsideración, notificada el 10 de mayo de 1978. No conformes, el 6 de febrero de 1979 instaron un pleito, al amparo de la Ley Federal de Derechos Civiles, 42 U.S.C. sec. 1983, contra los miembros de la Junta de Planificación y la Autoridad de Desarrollo y Conservación de Culebra, ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico. Alegaron que las actuaciones de los

---

[4] Los terrenos clasificados "P" afectaron a Culebra Enterprises, Corp. en 181.416 cuerdas y a Vango, Inc. en 26.752 cuerdas.

[5] Los terrenos clasificados "RO–25–C" se distribuían así: Culebra Enterprises 64.5302 cuerdas; Navgo, Inc. 72.3302 cuerdas; Govan 31.991 cuerdas, y Vango 29.118 cuerdas.

demandados violaron sus derechos civiles, al privarles de su propiedad sin el debido procedimiento de ley y que haber mantenido las zonificaciones "P" y "RO-25-C" constituía una incautación de la propiedad, sin compensación.

*El 15 de agosto de 1984*, tras nueve (9) años de estar en vigor la reglamentación aludida, en virtud de una estipulación aprobada por el Tribunal de Distrito federal,[6] las restricciones impuestas fueron eliminadas. *La Junta permitió la venta de los solares de cinco (5) cuerdas para el desarrollo proyectado originalmente, y de una (1) unidad de vivienda de uso vacacional por cada solar.* De esta forma desaparecieron las limitaciones al uso de las propiedades.

Quedó pendiente la reclamación por daños y perjuicios por la *privación temporera* del uso de la propiedad. El 28 de junio de 1985 fue desestimada por prematura. El Tribunal de Apelaciones Federal para el Primer Circuito la confirmó. Véase *Culebra Enterprises Corp. v. Rivera Ríos*, 813 F.2d 506 (1er Cir. 1987).

Así las cosas, el 17 de junio de 1986 demandaron al Estado Libre Asociado en el Tribunal Superior, Sala de Humacao. Alegaron que las designaciones de zonificación y uso constituyeron *una congelación total de la propiedad que les privó de todo uso.* Adujeron, además, que las incautaciones de la Junta constituyeron *una expropiación temporera sin justa compensación.*

El ilustrado tribunal de instancia (Hon. Aldo Segurola, Juez) resolvió que la acción estaba prescrita por haber sido presentada luego de haber transcurrido el año desde que las demandantes tuvieron conocimiento del daño, a saber, en 1975, cuando se rezonificaron los terrenos a distritos "P" y "RO-25-C". En revisión, mediante la opinión emitida en *Culebra Enterprises Corp. v. E.L.A.*, 127 D.P.R. 943 (1991), *revocamos* y devolvimos los autos al foro de instancia con el mandato de dilucidar, en sus méritos, el reclamo de incau-

---

[6] Dicho foro aprobó la estipulación el 27 de junio de 1985.

tación temporera por las clasificaciones impuestas por el Estado sobre los terrenos de las corporaciones.

Oportunamente, las demandantes solicitaron una sentencia sumaria parcial dirigida a las propiedades clasificadas como "P". El tribunal accedió y dictó una sentencia en la cual concluyó que el Estado les había privado *de todo uso productivo* sobre esas propiedades, mientras estuvo vigente la clasificación "P", es decir, desde *13 de agosto de 1975 a 15 de agosto de 1984.* Subsiguientemente, durante la vista evidenciaria para adjudicar la reclamación y compensación sobre las propiedades zonificadas "RO-25-C", las demandantes presentaron los testimonios de Andrew Fletcher —oficial de las corporaciones— Carlos Gaztambide —ingeniero, agrimensor y tasador— y el economista Bartolomé Stipec. El testimonio del agrónomo Santiago Crespo Ocasio fue estipulado. Aunque el tribunal le requirió de forma anticipada al Estado la presentación de prueba pericial sobre el valor de los daños, éste no lo hizo ni presentó prueba pericial para rebatir la de los demandantes. Subsiguientemente, en ninguna de las etapas ulteriores del litigio el Estado la presentó.(7)

En síntesis, el perito Gaztambide estableció, *primero*, el valor de cada parcela *antes* de la reglamentación y, *se-*

---

(7) Según lo indicado, el tribunal de instancia le requirió al Estado la presentación de prueba pericial ilustrativa sobre el valor de los terrenos. Celebrada la vista evidenciaria al respecto, sin ese beneficio, dicho foro pidió un memorando de autoridades y, a solicitud del Estado, concedió una prórroga para su presentación. Tras incumplir con ambas órdenes, emitió una orden contra el Lcdo. Miguel F. Díaz Lugo para que mostrara causa por la cual no debía ser encontrado incurso en desacato.

Finalmente, tras su incomparecencia a dos (2) señalamientos previos, durante la vista de 23 de enero de 1995 comparecieron el licenciado Díaz Lugo y su supervisor, Lcdo. Carlos E. Carrasquillo Soto. Argumentaron que la ausencia de prueba pericial se debió a: "la situación que había en la División Legal del Departamento de Justicia"; la cantidad de casos que tenían asignados; que su área de práctica era el derecho laboral, y que "tampoco se le proporcionó peritaje en la División de Tierras". Su supervisor, el licenciado Carrasquillo Soto, adujo la ausencia de recursos humanos en el departamento y la movilidad de los abogados hacia la práctica privada. No justificaron a satisfacción del tribunal el porqué no se contrataron perito y abogados externos.

El tribunal se abstuvo de imponer sanciones económicas al abogado Díaz Lugo, pero repudió su dejadez en la forma y representación de los intereses públicos en el litigio.

*gundo*, su valor residual *luego* de la nueva reglamentación. Para obtener esta cifra, las propiedades clasificadas como "P" no fueron valoradas, contrario a las clasificadas "RO-25-C". *Tercero*, consignó la pérdida de valor en el mercado luego de aplicada la zonificación establecida por la nueva reglamentación. Determinada la diferencia, Gaztambide estimó el valor de inversión de las parcelas para lo cual consideró, (a) los gastos en que se incurrió para la venta, que fueron descontados del valor en el mercado antes de la reglamentación; (b) el período durante el cual las parcelas serían vendidas (estimado en una parcela al mes durante un plazo de seis (6) años) y, por último, (c) la tasa de descuento para determinar el valor presente de las parcelas.[8]

Sobre los terrenos clasificados como "P" —doscientas ocho (208) cuerdas— el perito Gaztambide calculó en un millón novecientos setenta y un mil dólares ($1,971,000) su valor antes de la zonificación. Como consecuencia de la nueva clasificación, concluyó que perdieron *todo* valor. Posteriormente consideró que la venta de estos terrenos demo-

---

[8] El valor de los terrenos zonificados "RO-25-C", aproximadamente ciento noventa y ocho (198) cuerdas, fue estimado por el perito en un millón quinientos setenta mil dólares ($1,570,000), que según su método, redujo a doscientos cuarenta y un mil dólares ($241,000) luego de la zonificación. Consideró que la venta de las propiedades demoraría seis (6) años y produciría una ganancia neta de un millón cuatrocientos veintidós mil dólares ($1,422,000). A la cifra de un millón quinientos setenta mil dólares ($1,570,000) le descontó ciento cuarenta y ocho mil dólares ($148,000) en concepto de gastos de mercadeo y de venta de las propiedades.

La cantidad de un millón cuatrocientos veintidós mil dólares ($1,422,000), dividida entre el período de años de venta, arrojó un promedio de doscientos treinta y siete mil dólares ($237,000) como ganancia neta anual. Para calcular *el valor actual* de la ganancia un millón cuatrocientos veintidós mil dólares ($1,422,000) procedió a deducir el trece por ciento (13%) según su método. Estimó en novecientos cincuenta mil dólares ($950,000) el valor actual de la ganancia y, por último, a esta cifra le descontó doscientos cuarenta y un mil dólares ($241,000) —valor estimado de la propiedad luego de la zonificación "RO-25-C"— lo cual produjo un valor real de ganancia en setecientos diez mil dólares ($710,000).

Como segunda etapa del análisis económico, el otro perito, Stipec, concluyó que la suma de setecientos diez mil dólares ($710,000) hubiese devengado cuatrocientos noventa mil setecientos tres dólares ($490,703) en intereses durante la clasificación "RO-25-C".

Además, de esta cantidad reclaman doscientos ochenta y nueve mil novecientos ochenta y cinco dólares ($289,985) en concepto de los intereses que dicha suma debió devengar durante el período comprendido entre 16 de agosto de 1984 hasta el 20 de junio de 1995, para un gran total reclamado de setecientos ochenta mil seiscientos ochenta y ocho dólares ($780,688).

raría seis (6) años, a razón de la venta de una parcela por mes. Finalmente, opinó que la venta produciría un ingreso neto de un millón setecientos noventa y nueve mil dólares ($1,799,000). A esta cantidad le descontó ciento setenta y dos mil dólares ($172,000) por concepto de gastos de mercadeo y venta de las propiedades. Esta última cantidad se dividió entre el período de venta, estimando un ingreso neto anual de doscientos noventa y nueve mil ochocientos dólares ($299,800). Para calcular el valor actual de la ganancia, un millón setecientos noventa y nueve mil dólares ($1,799,000), descontó a razón del 13%[9] y así estimar el valor actual de la diferencia de valor en el mercado. La suma de las ganancias anuales convertidas a su valor actual reflejó un millón doscientos mil dólares ($1,200,000) como valor actual de la posible ganancia.[10]

En resumen, Culebra Enterprises *et al.* reclaman como justa compensación por la incautación temporera, la suma de dos millones cien mil ciento sesenta dólares ($2,100,160) distribuida así: un millón trescientos diecinueve mil cuatrocientos setenta y dos dólares ($1,319,472) por los terrenos zonificados como "P" y setecientos ochenta

---

[9] Esta fórmula fue explicada por el perito Gaztambide de la forma siguiente: el ingreso anual neto de doscientos noventa y nueve mil ochocientos dólares ($299,800) se divide entre $(1 + .13)^n$ en el que el exponente representa el número del año del 1 al 6.

[10] A base de la segunda etapa del análisis económico, las apelantes argumentan que hubiesen podido sostener una ganancia sobre el ingreso derivado de la venta de sus terrenos equivalente al interés prevaleciente en el mercado para inversiones seguras. Utilizando la cifra de un millón doscientos mil dólares ($1,200,000) como base, el economista Stipec aplicó las tasas de intereses prevalecientes en el mercado para inversiones seguras durante los años cuando las apelantes pudieron invertir sus ganancias. Calculó que dicha cantidad hubiese generado ochocientos veintinueve mil trescientos cincuenta y siete dólares ($829,357) en intereses. Así, pues, las apelantes reclamaron que la pérdida sufrida como consecuencia de la incautación sobre las doscientas ocho (208) cuerdas era equivalente a ochocientos veintinueve mil trescientos cincuenta y siete dólares ($829,357), más los intereses al seis por ciento (6%) devengados a partir del 16 de agosto de 1984 —fecha cuando cesaba la reglamentación "P"— hasta el 20 de junio de 1994 —fecha del juicio—. Estos intereses se calcularon en cuatrocientos noventa mil ciento dieciséis dólares ($490,116), que sumados a los ochocientos veintinueve mil trescientos cincuenta y siete dólares ($829,357), resultan en *un millón trescientos diecinueve mil cuatrocientos setenta y dos dólares ($1,319,472)*, cantidad reclamada por las apelantes como compensación por el período que sus propiedades estuvieron en la clasificación "P".

mil seiscientos ochenta y ocho dólares ($780,688) por aquellos clasificados "RO-25-C".

## II

El entonces Tribunal Superior de Humacao, Unidad Especial de Jueces de Apelaciones (Hon. Antonio Amadeo Murga, Juez), mediante su Sentencia de 3 de noviembre del 1994 concluyó que la clasificación "P", impuesta sobre doscientas ocho (208) cuerdas que eran propiedad de las apelantes, tuvo como único fin "conservar las tierras así clasificadas en su estado natural existente" sin que fuera su propósito ulterior expropiarlas "eventualmente para efectuar mejoras públicas". Dicha clasificación impidió *todo* uso de los terrenos durante el período que estuvo vigente la reglamentación, es decir, desde el 13 de agosto de 1975 al 15 de agosto de 1984. Además, razonó que tal privación de uso *constituyó una incautación temporera* sin justa compensación, contrario a nuestra Constitución y a la federal. Les reconoció el derecho a recibir una compensación por esa pérdida temporal.

Respecto a los terrenos clasificados "RO-25-C", el ilustrado foro sentenciador concluyó que, aunque el uso agrícola de estos terrenos era limitado y el uso más adecuado era destinarlos a residencias veraniegas, *las demandantes no fueron privadas de todo uso económico*, toda vez que podían agrupar los predios segregados de cinco (5) cuerdas en fincas de veinticinco (25) cuerdas y, así, venderlos para los usos dispuestos originalmente. No compensó por la zonificación impuesta a estas propiedades, según el criterio de que *no fueron privadas de todo uso económico beneficioso.*

Finalmente, en relación con la medida por daños en el caso de una *expropiación temporera*, reconoció que la compensación debía consistir en el "rendimiento que produjo o razonablemente debió producir la propiedad durante el período que duró la expropiación temporera" (Sentencia, pág.

21), considerando el mejor uso que pudo *brindársele a la propiedad*. Razonó que la ganancia que produciría la inversión del valor de la propiedad podía utilizarse como medida para fijar el valor del uso del terreno durante el tiempo de la incautación. Acogió el método que fijó en ($1,200,000) el valor de los terrenos clasificados "P", dedicados a su mejor uso. Además, aceptó que durante el tiempo en que estuvo vigente la reglamentación, esa cantidad pudo haber generado una ganancia de ochocientos veintinueve mil trescientos cincuenta y siete dólares ($829,357). No obstante, resolvió que al valor del terreno debía descontársele el elemento inflacionario, pues las demandantes recibieron la propiedad con un aumento de valor debido, entre otros factores, a la inflación acumulada.

Para compensar el rédito *real* por el uso de la tierra, adjudicó el uno por ciento (1%) anual como beneficio real dejado de recibir durante el período que duró la incautación temporera.[11] Tomando como correcto el valor de los terrenos clasificados "P" en un millón doscientos mil dólares ($1,200,000), estimó que durante el período de la incautación, las demandantes debían recibir el uno por ciento (1%) de dicho valor, es decir, *ciento ocho mil sesenta y cinco dólares con setenta y cinco centavos ($108,065.75)*.[12] Concedió, además, intereses al 5% anual desde el 17 de junio de 1986, fecha de presentación de la demanda. Por último, no concedió compensación alguna por la limitación de uso sobre los terrenos clasificados "RO-25-C". Por tal razón, la demanda fue desestimada con respecto a las corporaciones Navgo, Inc. y Govan, Inc., cuyas propiedades estaban so-

---

[11] El tribunal determinó este porcentaje considerando que durante ese período "la inflación era más alta y la economía más inestable, lo que provocó que la inflación se aproximara o cancelara totalmente el rédito razonable de mercado". Apéndice, pág. 51.

[12] Esta cifra se dividió así: noventa y cinco mil noventa y siete dólares con ochenta y seis centavos ($95,097.86) concedida a Culebra Enterprises y doce mil novecientos sesenta y siete dólares con ochenta y nueve centavos ($12,967.89) para Vango, Inc.

metidas a dicha clasificación. Los demandantes apelaron a este Foro.([13])

## III

Según lo indicado, el Art. II, Sec. 9 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 296, establece que "[n]o se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley".

A su amparo, hemos reconocido que "la autoridad [del Estado] para expropiar está limitada por la exigencia de que la cosa sea para un fin público y se pague justa compensación". *Culebra Enterprises Corp. v. E.L.A.*, supra, pág. 952. Véase *E.L.A. v. Rosso*, 95 D.P.R. 501, 536 (1967). De ordinario, el Estado ejerce directamente su poder constitucional al instar un recurso de expropiación. Como contraparte de este poder constitucional, existe la acción de *expropiación a la inversa* para remediar aquellos casos de ocupación física o incautación por medio de reglamentación, sin una consignación previa de justa compensación.([14]) Ahora bien, la obligación de pagar una

---

([13]) Los demandantes formularon y discutierorn los señalamientos de error siguientes:

"PRIMER ERROR

"Erró el Honorable Tribunal de Instancia al interpretar la Cláusula de Justa Compensación de la Constitución de Puerto Rico y de los Estados Unidos en los casos de incautaciones temporeras de propiedad inmueble como que procede '*descontar del rédito razonable* [del valor de la tierra durante el período de la privación] *el componente inflacionario incluido en le rédito...*' ... o tasa de interés basado en que el concluir el 'taking' se devuelve la propiedad con un valor mayor que el que tenía cuando el Estado se incautó de la misma reflejando alegadamente la inflación acumulada.

"SEGUNDO ERROR

"Erró el Honorable Tribunal de Instancia al desestimar la reclamación de las apelantes en cuanto a que sus ya existentes parcelas de cinco cuerdas zonificadas RO-25-C, podían ser agrupadas en parcelas de veinticinco cuerdas y venderlas para los mismos usos de recreo contemplados en la venta de cinco cuerdas." (Énfasis en el original.) Informe del Procurador General, pág. 12.

([14]) En *E.L.A. v. Northwestern Const., Inc.*, 103 D.P.R. 377, 383 (1975), reconocimos la existencia de esta acción denominada *inversa* "porque se insta por el dueño

compensación justa también cobra vigencia cuando el Estado realiza una "incautación de *hecho*" al afectar de manera sustancial el uso de la propiedad, físicamente o *por medio de su reglamentación. Hampton Development Corp. v. E.L.A.*, 139 D.P.R. 877 (1996); *Velázquez v. E.L.A.*, 135 D.P.R. 84 (1994); *Arenas Procesadas, Inc. v. E.L.A.*, 132 D.P.R. 593 (1993). Ante estas situaciones, la compensación comprenderá del valor de uso de la propiedad durante el tiempo en que el Estado privó al dueño de *todo uso productivo de ella. Hampton Development Corp. v. E.L.A.*, supra.

▮ El deber del Estado de indemnizar a los propietarios cuando la reglamentación estatal afecta *todo uso* de la propiedad, tuvo su génesis en la máxima enunciada por el Juez Holmes en *Penna. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922), en el sentido de que, "aunque la propiedad pueda ser reglamentada hasta cierto grado, si la reglamentación excede unos límites, se considerará que hubo una incautación". (Traducción nuestra.) Así, pues, es una norma establecida que cuando la reglamentación estatal conlleva privar al dueño de *todo uso efectivo* de su propiedad, el remedio constitucionalmente procedente es el pago de una compensación monetaria por el período que duró la reglamentación. *First Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987); *Agins v. Tiburon*, 447 U.S. 255 (1980); *Arenas Procesadas Inc. v. E.L.A.*, supra; *Culebra Enterprises Corp. v. E.L.A.*, supra. Al respecto, luego de haber sido determinada la existencia de una incautación temporera como consecuencia de la reglamentación estatal, la sola invalidación o su eliminación, sin una compensación por el uso de la propiedad durante el tiempo de su vigencia, *no es un remedio suficiente. First Lutheran Church v. Los Angeles County*, supra, pág. 319.

En una de sus más recientes expresiones, el Tribunal

---

de la propiedad contra el Estado para obtener la compensación a que tiene derecho". Los tribunales le han aplicado las mismas normas y principios que rigen la acción de expropiación instada por el Estado. *Olivero v. Autoridad de Carreteras*, 107 D.P.R. 301, 307 (1978); *Heftler International, Inc. v. J. de P.*, 99 D.P.R. 467 (1970).

Supremo federal reconoció que el requisito de compensación respondía al hecho de que una

> ... reglamentación que deje al dueño sin opciones productivas o beneficiosas para su uso, porque ésta requiere que su propiedad permanezca sustancialmente en su estado natural, implicará un alto riesgo de imponerle cierto tipo de servicio público con la excusa de mitigar algún daño público. Cuando ese balance de intereses se rompe, perjudicando al dueño, "[p]ensamos que existen buenas razones para nuestra reiterada creencia de que si el dueño de la propiedad inmueble es llamado a sacrificar todos los usos económicos beneficiosos a nombre del bienestar común, esto es, dejar su propiedad económicamente inerte, ha sufrido una incautación." (Traducción nuestra.) *Lucas v. So. Carolina Coastal Council,* 505 U.S. 1003, 1018–1019 (1992).

La razón de decidir es que la privación total del uso beneficioso de la propiedad, desde el punto de vista del dueño, equivale a una expropiación física. Ciertamente, la determinación final de si ocurrió una incautación variará en cada caso de acuerdo con los hechos específicos de cada controversia, sopesando distintos valores para obtener un equilibrio dinámico y razonable entre los intereses particulares y los de la comunidad. Entre los elementos que se han de considerar, hemos destacado los siguientes: la naturaleza de la actuación gubernamental; el impacto económico de la reglamentación sobre las personas o entidades afectadas, y si el impacto económico sobre el individuo es menor que el interés protegido por la reglamentación. *Hampton Development Corp. v. E.L.A.,* supra; *Arenas Procesadas, Inc. v. E.L.A.,* supra. Véase 2 *Rotunda and Nowak, Treatise on Constitutional Law: Substance and Procedure 2d* Secs. 15.12 y 15.14 (1992).

Conforme a esta normativa,[15] examinemos

---

[15] Cabe recordar también que el derecho de propiedad cumple con una función social, razón por la cual su ejercicio debe acomodar o servir los intereses de la sociedad, no exclusivamente de su titular. *Rivera v. R. Cobián Chinea & Co.,* 69 D.P.R. 672, 676 (1949). En este sentido, como expresáramos en *Luan Investment Corp. v. Ramos,* 125 D.P.R. 533, 547–548 (1990), seguido en *Carabarín et al. v. A.R.P.E.,* 132 D.P.R. 938 (1993):

*primeramente* el reclamo de que se configuró una incautación temporera vía la reglamentación estatal sobre aquellas propiedades clasificadas "RO-25-C", aproximadamente ciento noventa y ocho (198) cuerdas.

## IV

Esta clasificación (Núm. RO-25-C) es *de muy baja densidad poblacional,* que en la situación peculiar de Culebra se estableció para "conservar el paisaje natural y/o carácter agrícola del interior del Municipio de Culebra". Art. 6:00 de la Resolución Núm. JP-215-A de 12 de septiembre de 1975, Junta de Planificación, pág. 3-1. Las restricciones que impone sobre los terrenos son *sustanciales. Primero,* requiere un (1) solar cuya cabida *mínima* sea de veinticinco (25) cuerdas. *Segundo,* permite *únicamente* el uso para fines agrícolas y pastos para ganado. *Tercero,* sólo autoriza una (1) estructura que no exceda de dos (2) niveles, para uso inmediato del agricultor y su familia. *Cuarto,* el área de ocupación *no puede exceder* de trescientos metros cuadrados (300 m$^2$) por unidad de vivienda. Ante estas limitaciones, *la ilustrada sala sentenciadora concluyó que la*

---

"La zonificación es uno de los instrumentos conferidos por el legislador a la Junta [de Planificación] para llevar a cabo sus funciones dentro de una sociedad y un gobierno cada vez más complejos, un sistema abierto que confronta innumerables presiones como resultado de necesidades y aspiraciones conflictivas y que experimenta unos cambios sociales acelerados dentro de su escala reducida, escasez de terreno y recursos naturales, alta densidad poblacional y un ecosistema frágil. Dicho instrumento fortalece aquellas funciones de la Junta relacionadas con la orientación, coordinación e integración de la política pública sobre el desarrollo integral del país, así como de sus funciones de investigación, información y asesoramiento. ...

"Mediante la reglamentación de zonificación, el Estado asume un rol activo en el proceso de control y regulación de la utilización del limitado recurso tierra y de nuestro frágil ecosistema a fin de armonizar intereses y aspiraciones con las menores perturbaciones sociales."

También reafirmamos que el derecho a indemnización no se activa "simplemente porque la reglamentación impid[a] el uso más óptimo o productivo de la misma". *Arenas Procesadas, Inc. v. E.L.A.,* 132 D.P.R. 593 (1993), y casos allí citados. Tampoco procede per se una compensación cuando la reglamentación tenga el efecto de disminuir su valor.

*actividad agrícola en Culebra no es económicamente viable.*
Reconoció que "dada la singular belleza y atractivo casi
paradisiaco de Culebra, *el uso más adecuado del terreno
era para la construcción de residencias de verano*". (Énfasis
suplido.) Apéndice, pág. 38. No obstante, dicho foro justi-
ficó su negativa a compensar por los terrenos así clasifica-
dos sobre el frágil argumento de que las apelantes podían
agrupar las fincas existentes en nuevas fincas de veinti-
cinco (25) cuerdas y revenderlas para los fines original-
mente propuestos. Es decir, una (1) residencia veraniega
por finca. En consecuencia, rehusó concluir que la clasifi-
cación RO-25-C configuró una privación de *todo uso econó-
mico de los terrenos.*

Aunque este razonamiento es respetable, no podemos
abordar esta controversia en abstracto. Su adjudicación fi-
nal requiere un análisis pragmático, habida cuenta de que
la tierra en Puerto Rico es un recurso natural escaso y de
continuo incremento en el valor, resultado natural del au-
mento poblacional y desarrollo industrial. *E.L.A. v. Rodrí-
guez,* 103 D.P.R. 636 (1975).

Al conjugar los diversos factores implicados —extensión
geográfica limitada, topografía accidentada, clima, poca
precipitación pluvial, ausencia de abastos de agua y dis-
tanciamiento de los mercados potenciales— es ineludible
concluir que la actividad agrícola en Culebra es casi
inexistente. Si a estos factores añadimos el tipo de suelo
(los terrenos clasificados "RO-25-C" consistían en *series de
suelos compuestos de descalabrado y roca volcánica*) en el
área, cuyas características son la poca profundidad y ferti-
lidad, y propensos a daños por erosión, comprendemos me-
jor la poca actividad y pobre potencial agrícola.

Aun así, la Junta impuso esta zonificación en la isla de
Culebra, cuyo tamaño aproximado es 10.23 millas cuadra-
das, equivalente a siete mil trescientas cuatro (7,304) cuer-
das de terreno. En Puerto Rico ("la Isla Grande"), para
1992 había un total de veintidós mil trescientas cincuenta
(22,350) fincas, cuyas cabidas totalizaban ochocientas vein-
tiséis mil ochocientas noventa y tres (826,893) cuerdas de

terreno. De estos, el sesenta y seis por ciento (66%) tenían un tamaño *menor* de veinte (20) cuerdas. I (Parte 52) *U.S. Department of Commerce: Census of Agriculture*, Puerto Rico, 1952. Es un contrasentido exigir en Culebra fincas de veinticinco (25) cuerdas, cuando en nuestra isla —cuyo territorio es sustancialmente mayor— la realidad demuestra que las fincas agrícolas son de menor tamaño.

Esta realidad no era desconocida por la Junta al imponer la nueva zonificación. Descartado el uso agrícola, por las características geográficas y geológicas, es evidente que la clasificación "RO-25-2" tuvo el efecto inmediato de obligar a conservar los terrenos en su estado natural. Ante esa realidad innegable, discrepamos de la propuesta del foro de instancia, al establecer como uso posible la edificación de unas segundas residencias por cada solar de veinticinco (25) cuerdas. Ese remedio es incongruente con la clasificación en controversia; se aparta de la realidad social y las características de este tipo de casa veraniega. Repetimos, según la clasificación en controversia, sólo podían destinarse los terrenos a usos agrícolas, no para fines recreacionales.

Por otra parte, la realidad puertorriqueña demuestra que las llamadas "segundas residencias", usualmente consisten de apartamentos o residencias que se ubican en predios que varían entre trescientos o seiscientos metros cuadrados (300 ó 600 m$^2$), una cuerda (3930.39 m$^2$) o, quizás, un máximo de cinco (5) cuerdas (19651.95 m$^2$). Es ilusorio que un individuo adquiera veinticinco (25) cuerdas de terreno (98,258 m$^2$) para construir *una* (1) casa de veraneo. Una finca de veinticinco (25) cuerdas representa una vasta extensión de terreno que, considerando su costo, pocos pueden sufragar. Aun cuando esa posibilidad fuera real, implicaría que sólo una minoría de ciudadanos podrá disfrutar de la belleza excepcional y parajes extraordinarios de la isla de Culebra, en detrimento de una mayoría de la población.

En conclusión, establecida la dificultad de la actividad agrícola y reconocido que el mejor uso de los terrenos era

dedicarlos a residencias veraniegas, es forzoso concluir que las restricciones de la clasificación "RO-25-C", sobre los 197.971 cuerdas, impidieron *todo* su uso productivo. Por ende, la reglamentación configuró una *incautación tempo-rera de la propiedad que exige el pago de una compensación justa.* Incidió el ilustrado tribunal de instancia.

Igual solución se impone con respecto a aquellos terrenos clasificados "P", aproximadamente doscientas ocho (208) cuerdas. Al reservarse dichas propiedades para *uso exclusivo* por parte del Estado, los propietarios quedaron desprovistos de conferirle cualquier uso productivo a éstos. Esta zonificación, vigente desde el 13 de agosto de 1975 al 15 de agosto de 1984 —nueve (9) años— claramente constituyó una incautación temporera de la propiedad por vía de reglamentación.[16] El Estado tuvo tiempo suficiente para iniciar formalmente un proceso de expropiación. No lo hizo. Estamos convencidos de que, bajo los parámetros constitucionales y legales prevalecientes, las particularidades de este caso configuraron una incautación temporera de la propiedad que exige una justa compensación equivalente al valor de uso de la propiedad durante el tiempo que duró la reglamentación. Así aclarado, examinemos la compensación.

## V

Reafirmamos la norma de que, como foro apelativo, no estamos obligados "a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo ... y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación o evaluación de la prueba pericial y hasta descartar la misma aunque resulte ser técnicamente correcta". *Prieto v. Maryland Ca-*

---

[16] Anteriormente hemos expresado que "[u]na clasificación 'P' constituye casi una total congelación. El propietario no puede utilizarlo durante el tiempo que esté así clasificado. Suena casi a una expropiación aunque sin compensación". *Heftler International, Inc. v. J. de P.,* supra, pág. 474.

*sualty Co.*, 98 D.P.R. 594, 623 (1970). Véanse: *Gallardo v. Petiton y V.T.N., Inc.*, 132 D.P.R. 39 (1992); *Díaz García v. Aponte Aponte*, 125 D.P.R. 1, 13 (1989).

 También reiteramos la doctrina establecida de que sólo intervendremos si la cuantía es exagerada o muy baja. *Vélez Rodríguez v. Amaro Cora*, 138 D.P.R. 182 (1995); *Torres Solís et al. v. A.E.E. et als.*, 136 D.P.R. 302 (1994); *Sanabria v. E.L.A.*, 132 D.P.R. 769 (1993); *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985).

Según expuesto, las apelantes Culebra Enterprises, Corp. *et al.* impugnan por *insuficientes* los ciento ocho mil dólares ($108,000) concedidos por el tribunal de instancia como indemnización por el daño causado debido a la pérdida de uso de los terrenos durante nueve (9) años de vigencia de la reglamentación impugnada. Además, según hemos reconocido, procede una compensación por la incautación temporera de los terrenos clasificados "RO-25-C". En cuanto al primer extremo, coincidimos. Si realizáramos un cálculo matemático dividiendo la suma concedida —ciento ocho mil sesenta y cinco dólares con setenta y cinco centavos ($108,065.75)— entre la totalidad de los terrenos —doscientas ocho (208) cuerdas— resultaría en un rendimiento por cuerda ascendente a quinientos diecinueve dólares con cincuenta y cinco centavos ($519.55). Esta cifra dividida entre nueve (9) años equivale a que el Estado terminó pagando aproximadamente un canon irrisorio de cincuenta y siete dólares con setenta y dos centavos ($57.72) anual por cada cuerda de terreno. La naturaleza de la actuación gubernamental tuvo el efecto de paralizar durante esos años el desarrollo originalmente propuesto, así como cualquier otro uso posible, sobre las cuatrocientas seis (406) cuerdas.

Ello, unido a la extensión de los terrenos reservados para uso público, sin que el Estado siquiera iniciara un proceso formal de expropiación, nos obliga a coincidir con el reclamo de que la cuantía concedida es insuficiente.

# VI

Concluido que ocurrió una incautación temporera sobre toda la propiedad de las apelantes, procede determinar la indemnización por la pérdida del valor de uso de la propiedad durante el periodo que estuvo vigente la reglamentación. La cuestión es novel y sumamente compleja. El Tribunal Supremo federal no ha adoptado ninguna fórmula particular para calcular este tipo de compensación, probablemente debido al carácter innovador del remedio. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, supra; *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987); *Lucas v. So. Carolina Coast Council*, supra. Al así actuar ha dejado a la discreción de los tribunales la valoración de los daños, conforme a las circunstancias particulares de cada caso y a los diferentes métodos de cálculo propuestos. Algunos tribunales estatales y apelativos han desarrollado y aplicado diversos métodos. Al presente, ninguno predomina. J. Mikitish, *Measuring Damages for Temporary Regulatory Takings: Against Undue Formalism*, 32 Ariz. L. Rev. 985 (1990); C. Barnes, *Just Compensation or Just Damages: The Measure of Damages for Temporary Regulatory Takings in Wheeler v. City of Pleasant Grove*, 74 Iowa L. Rev. 1243 (1989).

Entre los métodos propuestos se destacan los siguientes: el precio de la opción,[17] canon de arrendamiento,[18] la

---

[17] *Opción de precio ("option price")*: La compensación equivale a una opción de compra de la propiedad. Este método no ha sido favorecido, pues difícilmente las autoridades interesan adquirir una propiedad incautada temporalmente.

[18] *Canon de arrendamiento ("the rental approach")*. Ha sido utilizado luego de la Segunda Guerra Mundial para compensar los dueños de propiedades incautadas por el Estado para uso exclusivo de las fuerzas armadas. Véanse: *Kimball Laundry Co. v. U.S.*, 338 U.S. 1 (1949); *U.S. v. General Motors Corp.*, 323 U.S. 373 (1945). Al igual que el método de opción, ha sido descartado pues en la mayoría de las ocasiones el terreno no ha sido desarrollado, y probablemente carece de un valor rentable. W.J. Patton, *Affirmative Relief for Temporary Regulatory Takings*, 48 U. Pitt. L. Rev. 1215 (1987).

realidad del daño,[19] la medida del daño,[20] la valoración de los daños y el rendimiento en el mercado de la diferencia del valor de la propiedad antes y después de la reglamentación.[21]

[19] *Daño real ("out of pocket damages")*. En *City of Austin v. Teague*, 570 S.W.2d 389 (1978), se negó a los propietarios un permiso de desarrollo con el único propósito de mantener el área en estado natural y preservar la vista panorámica hacia el sur de la ciudad. El foro apelativo requirió que los daños alegados fuesen establecidos certeramente, rechazando como fundamento para compensar las rentas y ganancias futuras de la propiedad por calificarlas de especulativas. Lo devolvió para una vista al efecto. Véase, además, *Taub v. City of Deer Park*, 882 S.W.2d 824 (1994).

[20] *Medida del daño ("tort measure")*. En *Corrigan v. City of Scottsdale*, 720 P.2d 513 (Ariz. 1986), se rehusó aceptar un método particular para calcular la indemnización, al aducir una complejidad en determinar si ocurrió una incautación temporera de la propiedad, la realidad del daño y el carácter especulativo de los daños reclamados por los propietarios. Finalmente, se concluyó que la indemnización por daños debía reconocerse a la luz de las particularidades de cada caso. 8 *Roham y Reskin, Nichols on Eminent Domain 3d* Sec. 14E.05-06 (1996); R. Roddewig and C. Duersken, *Measuring Damages in Takings Cases: The Next Frontier*, Zooning and Planning Law Handbook, 1993, pág. 273.

[21] *Rendimiento en el mercado de la diferencia en el valor de la propiedad antes y después de la reglamentación ("return on before and after increment of value")*. En *Nemmers v. City of Dubuque*, 764 F.2d 502 (8vo Cir. 1985), el propietario de un terreno clasificado como industrial-liviano reclamó el pago de una compensación cuando el Estado rezonificó parte de la propiedad a uso residencial. El Tribunal de Apelaciones federal estimó que debía de calcularse a base del rendimiento que hubiese producido la diferencia entre el valor de la propiedad según la clasificación anterior y su valor tras la nueva zonificación, durante el período en que estuvo vigente la zonificación impugnada. En la determinación de la cuantía trazó cinco (5) etapas: (1) la determinación del valor de la propiedad antes y después de la zonificación; (2) el plazo durante el cual ocurrió la incautación; (3) una tasa de rendimiento razonable; (4) multiplicación de los la diferencia en valores por la tasa de rendimiento para producir el rendimiento anual no devengado, y (5) la multiplicación del rendimiento anual por el plazo de la incautación. Este método también fue utilizado en *Front Royal and Warren Cty. v. Town of Front Royal*, 749 F. Supp. 1439 (Va. 1990).

*Wheeler v. City of Pleasant Grove*, 896 F.2d 1347 (11mo Cir. 1990), (en adelante *Wheeler IV*) siguió este método. Un desarrollador de terrenos demandó al gobierno municipal, luego de que las autoridades locales revocaran un permiso para la construcción de un complejo de apartamentos y aprobaran una ordenanza que prohibiera la construcción de nuevos edificios. El Tribunal de Distrito federal concluyó que la ordenanza era inconstitucional, pues limitaba considerablemente el uso de la propiedad, pero se negó a conceder la indemnización. Luego de tres (3) apelaciones, el Tribunal de Circuito reconoció que durante una incautación temporera, el daño al propietario se manifiesta como un menoscabo al potencial de la propiedad para generar ingresos. Así definido, sugirió el método utilizado en *Nemmers v. City of Dubuque*, supra, a los fines de estimar el resarcimiento. Véase *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 271 (1987). No obstante, en la última apelación, *Wheeler IV*, el foro apelativo se apartó de la norma que había reconocido previamente y no utilizó exclusivamente como parámetro el valor del terreno, sino que le agregó el valor del derecho del propietario para desarrollarlo.

 Se observa, pues, que la valoración de la compensación en este tipo de controversias es sumamente compleja y contiene *una gran dosis de especulación*, debido a la multiplicidad de las circunstancias y los factores que pueden incidir durante una incautación temporera y a los diversos elementos aleatorios que influyen en su cómputo. Sin embargo, no cabe duda de que el propósito de la indemnización monetaria es resarcir al propietario por las pérdidas sufridas como consecuencia de la incautación temporera.

En esta etapa del litigio, la ausencia total de prueba de una parte (el Estado) dificulta enjuiciar los reclamos de las apelantes. Esta situación nos obliga a abstenernos en este momento de expresarnos sobre cuál de los métodos ensayados satisface adecuadamente una justa compensación cuando ocurre una incautación temporera de la propiedad.

*Resolvemos devolver los autos originales al tribunal de instancia para que, previa vista evidenciaria, proceda a reevaluar la justa compensación que habrá de concederse.* Al proponer este curso de acción, lejos de dar una injustificada oportunidad al Estado de dilucidar de nuevo la cuantía que habrá de concederse, promovemos la celebración de un procedimiento equilibrado y justo en el que el juzgador tenga ante sí todos los elementos que le permitan hacer cumplida justicia. Esta solución es comprensible y justa debido a la pericia que este tipo de casos exige, los múltiples factores que inciden sobre la determinación final y lo novel de la fórmula que finalmente adoptemos, la cual con toda probabilidad servirá de precedente para casos posteriores.[22]

---

[22] En situaciones como la de autos, ante controversias noveles de naturaleza técnica y altamente especializada, el tribunal siempre puede ejercitar su facultad de nombrar un perito judicial que le auxilie en esa delicada tarea, al amparo de la Regla 23.1(c)(4) de Procedimiento Civil, 32 L.P.R.A. Ap. III, y la Regla 59 de Evidencia, 32 L.P.R.A. Ap. IV. *Pueblo ex rel. L.V.C.*, 110 D.P.R. 114, 129 (1980); *Toppel v. Toppel*, 114 D.P.R. 16, 20–21 (1983); *San Lorenzo Trad., Inc. v. Hernández*, 114 D.P.R. 704 (1983).

*Se dictará la correspondiente sentencia.*

Los Jueces Asociados Señores Rebollo López y Hernández Denton emitieron sendas opiniones concurrentes y disidentes. El Juez Asociado Señor Fuster Berlingeri disintió sin opinión escrita.

— O —

Opinión concurrente y disidente emitida por el Juez Asociado Señor Rebollo López.

A pesar de que *coincidimos* con la mayoría de los integrantes del Tribunal en el resumen que hace de la normativa imperante en nuestra jurisdicción referente a los derechos que asisten a los ciudadanos frente al poder de expropiación del Estado, *diferimos vehementemente* de la disposición que del caso hace la mayoría, esto es, del resultado del mismo.

I

Como correctamente se señala en la Opinión mayoritaria, la obligación de pagar por parte del Estado al amparo de las disposiciones de la Sec. 9 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, no sólo se activa cuando éste insta directamente, en la consecución de un fin público, un recurso de expropiación, sino cuando el Estado realiza una "incautación de hecho" de la propiedad, ya sea físicamente o por medio de reglamentación a esos efectos.

Endosamos la posición que asume la mayoría en el presente caso a los efectos de que esa "incautación de hecho" ocurre cuando la acción gubernamental "afecta sustancialmente el uso de la propiedad"; cuando la reglamentación " 'deje al dueño sin opciones productivas o beneficiosas para su uso, porque ésta requiere que su propiedad permanezca sustancialmente en su estado natural' " (opinión ma-

yoritaria, pág. 948, citando a *Lucas v. So. Carolina Coastal Council*, 505 U.S. 1003, 1018 (1992)), y/o cuando la acción del Estado priva al dueño de la propiedad del "uso más adecuado" de la misma. *En otras palabras, cuando se da cualquiera de las situaciones antes expuestas, se entiende que la acción gubernamental ha impedido "todo uso productivo" de la propiedad afectada y que, en consecuencia, se ha configurado una "incautación temporera de la propiedad que exige el pago de una justa compensación"*; ello al amparo, repetimos, de las disposiciones de la Sec. 9 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, ante.

Dados los hechos particulares del presente caso, según los mismos surgen de la opinión mayoritaria, estimamos correcta la determinación de la mayoría de que eso fue precisamente lo que ocurrió en el mismo; esto es, que en el presente caso ocurrió una incautación temporera de la propiedad en controversia que exige el pago de una justa compensación ya que no resulta suficiente, desde un punto de vista constitucional, la mera invalidación o eliminación de la reglamentación impugnada.

## II

Ahora bien, *no* podemos endosar ni suscribir el "remedio" que provee la mayoría en este caso para la situación descrita anteriormente. Esto es, diferimos vehementemente de la determinación de la mayoría de *"devolver los autos originales al tribunal de instancia para que, previa vista evidenciaria, proceda a reevaluar la justa compensación que habrá de concederse"* a los apelantes. (Énfasis en el original.) Opinión mayoritaria, pág. 956.

Como surge de la propia opinión mayoritaria, el tribunal de instancia no sólo señaló una vista con el *propósito expreso* de determinar la compensación a ser concedida a los apelantes, *sino que* "le requirió de forma anticipada al Estado la presentación de prueba pericial sobre el valor de los daños" a concederse a éstos. Opinión mayoritaria, págs.

941. *El Estado no sólo no presentó dicha prueba pericial en su turno correspondiente, sino que no presentó prueba para refutar la prueba pericial que presentaron los apelantes sobre los daños por ellos sufridos.* De hecho, y como surge de la opinión mayoritaria, pág. 941 esc. 7, el Estado *incumplió repetidamente* con los requerimientos que el tribunal de instancia le hiciera a esos efectos; ello al extremo de que dicho foro judicial se vio obligado a emitir una orden para que el abogado del Estado mostrara causa por la cual no debía ser encontrado incurso en desacato.

La "excusa" ofrecida por dicho abogado (licenciado Díaz Lugo) no sólo causa consternación en nuestro ánimo judicial, sino gran preocupación sobre cómo se defienden los intereses del Pueblo de Puerto Rico por los funcionarios que tienen dicha encomienda. Dicho abogado expresó en la vista señalada para mostrar causa, según el resumen que hizo el tribunal de instancia, que

> ... la ausencia de prueba pericial se debió a: "la situación que había en la División Legal del Departamento de Justicia"; la cantidad de casos que tenían asignados; que su área de práctica era el derecho laboral, y que "tampoco se le proporcionó peritaje en la División de Tierras". Su supervisor, Lcdo. Carrasquillo Soto, adujo la ausencia de recursos humanos en el departamento y la movilidad de los abogados hacia la práctica privada. Opinión mayoritaria, pág. 941 esc. 7.

*Ante esta situación, ¿qué hace la mayoría?* En nuestra humilde opinión, el Tribunal en el día de hoy *premia* la desidia, la displicencia y la incompetencia de los funcionarios designados por el Estado para representar, y defender, sus intereses en esta clase de casos; *ello en perjuicio no sólo de una sana administración de la justicia, sino de los intereses de unos apelantes que, en todo momento, cumplieron a cabalidad con los requerimientos que nuestro ordenamiento jurídico les impone.*

Los aquí apelantes presentaron, según les fue requerido por el tribunal de instancia, prueba pericial respecto a los daños por ellos sufridos como consecuencia de la incautación temporera de su propiedad. Dicha prueba pericial,

procede enfatizar, fue presentada por medio de peritos en la materia, cuya capacidad y competencia profesional nunca ha sido cuestionada, mucho menos su credibilidad. Por otro lado, el razonamiento utilizado por estos peritos y el método utilizado por ellos en la valoración de los daños sufridos por los apelantes, como consecuencia de la acción gubernamental, tampoco ha sido objeto de impugnación o señalamiento alguno.

Constituye jurisprudencia reiterada que la declaración de un testigo, no contradicha, sobre un hecho determinado *debe merecer* crédito al juzgador de los hechos, *a menos que* su declaración sea físicamente imposible o inverosímil o que, por sus contradicciones o su conducta en la silla testifical, sea indigno de crédito. *Miranda Soto v. Mena Eró*, 109 D.P.R. 473 (1980); *Villalonga, Com. v. Tribl. de Distrito*, 74 D.P.R. 331 (1953); *Biaggi v. Sucn. Esbrí*, 71 D.P.R. 450 (1950); *Cintrón v. Cintrón*, 70 D.P.R. 770 (1950); *Caballero v. González*, 53 D.P.R. 539 (1938).

Es correcto que la citada jurisprudencia *no* se refiere, en específico, a testigos periciales y que, como señala la mayoría, en relación con éstos hemos resuelto "que, como foro apelativo, no estamos obligados a 'seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito' ".

*Ahora bien*, de la misma manera en que un tribunal de instancia *no* puede arbitrariamente descartar el testimonio de un testigo sobre un hecho en controversia —a menos que el mismo sea inverosímil o físicamente imposible, etc.— *este Tribunal tampoco está facultado para descartar, de manera arbitraria, un testimonio pericial que fue presentado a nivel de instancia.* Nadie, incluyendo a este Tribunal, tiene discreción absoluta. La acción de la mayoría de brindar una *"segunda oportunidad"* al Estado es totalmente errónea; *sobre todo en el presente caso en que el Estado, habiéndosele brindado la oportunidad para hacerlo, se cruzó de brazos y no presentó prueba pericial alguna, aduciendo una increíblemente pobre excusa para tratar de justificar su irresponsable actuación.* Debe recordarse que

el Derecho en Puerto Rico es rogado y de carácter adversativo, *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990), y que la función del juez no es "salvarle" el caso a un litigante que no cumple con lo preceptuado en nuestro ordenamiento jurídico; mucho menos al Estado, el cual es un litigante poderoso.

Un análisis de la prueba pericial presentada por los apelantes a nivel de instancia, respecto a los daños sufridos por éstos como consecuencia de la acción gubernamental impugnada, demuestra que la misma es una lógica y razonable. En consecuencia, *no* hay razón alguna para descartar la misma. *Más aún, cuando consideramos el hecho de que la mayoría no establece, o resuelve, cuál es el método valorativo correcto a utilizarse en esta clase de situaciones, dejando la cuestión "en el aire".*

En resumen, esta *segunda oportunidad* que brinda el Tribunal al Estado para cumplir con la obligación original que desperdició, sin excusa válida alguna, resulta ser totalmente improcedente en derecho. Es por ello que nos vemos obligados a disentir.

— O —

Opinión concurrente y disidente emitida por el Juez Asociado Señor Hernández Denton.

El curso de acción tomado hoy por la mayoría limita significativamente el poder de la Junta de Planificación de Puerto Rico para guiar el desarrollo integral del País en pro del bienestar general. Por entender que las aproximadamente ciento noventa y ocho (198) cuerdas de las demandantes que fueron clasificadas "RO-25-C" por el Estado no perdieron todo su uso productivo y que, por ende, el Estado no está obligado al pago de una justa compensación, disentimos. El hecho de que una zonificación impida el mejor uso productivo o el uso ideal de un terreno, no implica que éste ha sido privado de todo uso.

No empece lo anterior, creemos que debe devolverse el

caso al tribunal de instancia para que, previa vista eviden-
ciaria, determine la cantidad a concederse como indemni-
zación *por la incautación de los otros terrenos de aproxima-
damente doscientas ocho (208) cuerdas de las deman-
dantes, que fueron ubicados bajo la clasificación "P".*

I

Antes de exponer los hechos pertinentes, conviene esbo-
zar brevemente el trasfondo histórico de la isla Municipio
de Culebra, de forma tal que podamos ubicar la controver-
sia de autos dentro del contexto particular en que ésta se
da. Debido a que el desarrollo de este municipio fue muy
peculiar, dadas sus condiciones particulares de isla, es me-
nester considerar ciertos aspectos relativos a su desarrollo.

La isla de Culebra permaneció virgen y despoblada
hasta 1880, cuando arribaron a ella sus primeros pobla-
dores. C. Delgado Cintrón, *Las concesiones privadas y las
zonas públicas de terrenos en la isla de Culebra: un análi-
sis histórico y jurídico,* 31 Rev. C. Abo. P.R. 1, 7 (1970). La
Corona Española había decidido emprender su coloniza-
ción, y para ello se utilizaron los mecanismos previamente
implantados con éxito para colonizar a Vieques. Se conce-
dió una parcela urbana y una rural, entre otros incentivos,
a aquellos aspirantes que cumplieran con determinados re-
quisitos y se comprometieran a permanecer indefinida-
mente en la isla, a cultivar totalmente el terreno cedido y a
defender la isla. Íd. A pesar de que se habían asignado
preliminarmente varios lotes y que éstos estaban siendo
trabajados, no fue hasta 1888 que se efectuó la división
parcelaria. Véase el Plano de la Isla de Culebra de 1888.

El proceso colonizador de Culebra estaba en creciente
desarrollo cuando en 1898 fue interrumpido por la Guerra
Hispanoamericana. Para esa fecha ya se habían otorgado
títulos definitivos a muchos de los vecinos-colonos. Delgado
Cintrón, *supra,* pág. 59. Tras la cesión de Puerto Rico a
Estados Unidos como consecuencia de la guerra, la Marina
estadounidense ocupó la isla de Culebra en 1902, y perma-

neció allí hasta 1911. Durante ese período se desalojaron a los colonos que habían constituido el único emplazamiento urbano de la isla, llamado San Ildefonso de la Culebra, y se obligó a éstos a dispersarse por las estancias rurales. Informe Núm. 1970-CDC-015 de la Comisión de Derechos Civiles de 6 de mayo de 1970, pág. 108, titulado "La Isla Municipio de Culebra y los Derechos Civiles (La Instrumentación por la Marina de la Orden Ejecutiva Número 8684 del Presidente de los Estados Unidos de América sobre la Isla-Municipio de Culebra y los Derechos Civiles)".

Hacia 1924, la Marina inició de nuevo su penetración en Culebra, emprendiendo esporádicamente ejercicios y maniobras militares en la isla. En 1936, ésta se estableció definitivamente en los terrenos pertenecientes a Estados Unidos.[1] A partir de esa fecha se intensificaron las prácticas militares en Culebra, particularmente en la parte noroeste de la isla. Ello obligó a que los estancieros de esa región tuvieran que abandonar sus propiedades y faenas agrícolas, principalmente la ganadería, en busca de un lugar más seguro y propio para su fomento económico. Informe Núm. 1970-CDC-015, *supra*, págs. 113–114. El desplazamiento interno de residentes, suscitado a raíz de la llegada de la Marina norteamericana, dio pie a que se formara el poblado de Dewey. Íd., pág. 114.

Posteriormente, en 1941, se declaró a la isla de Culebra como "Área de Defensa Marítima y de Reservación Aérea" (hasta un perímetro de tres (3) millas alrededor de la isla).[2] A partir de febrero de 1941 no se podía penetrar en esta área a no ser que fuera en una embarcación pública de Estados Unidos y mediante una autorización previa del Secretario de la Marina.

Como consecuencia de las aún más intensas prácticas y

[1] Estos terrenos habían sido reservados para propósitos de defensa desde 1903 por el entonces Presidente Teodoro Roosevelt. Véanse: 32 Stat. 731 (1902); Proclama Presidencial Núm. 4 de 26 de junio de 1903.

[2] Ello se dio en virtud de la Orden Presidencial Núm. 8684, emitida por el entonces Presidente Franklin D. Roosevelt el 14 de febrero de 1941. 6 Fed. Reg. 1016 (1941).

maniobras de la Marina y de las restricciones en el tráfico marítimo y aéreo, la industria ganadera desapareció comercialmente de Culebra, pues dichas restricciones impedían conducir el ganado y sus productos derivados a Vieques y a Puerto Rico en una forma económicamente productiva. Informe Núm. 1970-CDC-015, *supra*, pág. 137. Para mediados de la década de los sesenta la condición se tornó prácticamente insostenible para la población de la isla, la cual se dirigió al Gobierno para plantear su problemática y creó consciencia·en el resto de sus conciudadanos. Íd., págs. 143–150.

La condición de Culebra, entonces, como área restringida, desalentó un sinnúmero de proyectos privados y gubernamentales de desarrollo industrial, residencial, turístico y deportivo; por lo que la isla permaneció subdesarrollada durante los años en que el resto de Puerto Rico creció económicamente. Informe Núm. 1970-CDC-015, *supra*, págs. 136–137.[3]

Es hacia mediados de la década de los sesenta que, según la situación descrita anteriormente, las corporaciones demandantes —Culebra Enterprises Corp., Navgo, Inc.; Vango, Inc., y Govan, Inc.— comenzaron a adquirir grandes porciones de terrenos en la isla de Culebra con la intención de desarrollarlas y urbanizarlas.[4] Planificaban segregarlas en pequeñas parcelas, de cinco (5) cuerdas cada una, y venderlas para que sus adquirentes posteriormente construyeran en éstas residencias de veraneo. Para esa fecha, Culebra se encontraba todavía sujeta a las restricciones impuestas como consecuencia de su ocupación por parte de la Marina de Estados Unidos.

---

[3] En particular, hacia finales del década de los sesenta, varios dueños de terrenos desistieron de los proyectos de desarrollo de solares para casas de veraneo, dadas las restricciones impuestas por la Marina. Informe Núm. 1970-CDC-195 de la Comisión de Derechos Civiles de 6 de mayo de 1970, pág. 138.

[4] Las compraventas fueron realizadas entre 1966 y 1970. Las corporaciones acumularon aproximadamente cuatrocientas seis (406) cuerdas de terrenos sin desarrollar en el área noreste de la isla, ubicadas en los barrios Fraile y San Isidro, y que bordeaban al Puerto del Manglar.

No obstante, en 1969 Culebra Enterprises Corp. sometió una consulta ante la Junta de Planificación para la ubicación del mencionado proyecto de viviendas turísticas veraniegas en aproximadamente setenta y nueve (79) cuerdas de su propiedad. Consulta de ubicación para proyecto de viviendas veraniegas turísticas en los barrios Fraile y San Isidro en Culebra Núm. 69-135-U, Junta de Planificación, 1969. Inicialmente la consulta fue denegada debido a la "ausencia de facilidades en el área" y "por ser un proyecto incompatible con el carácter rural del área". Consulta Núm. 69-135-U, *supra*, pág. 1, primera extensión al Informe Núm. 70-U-003 de 9 de julio de 1969. Posteriormente en reconsideración, la consulta fue aprobada sujeta al cumplimiento de determinadas condiciones, que fueron detalladas por la Junta de Planificación en su Informe Núm. 70-U-003 (primera extensión) de 2 de octubre de 1969. Sin embargo, el proyecto no se cristalizó debido a la intervención de la Marina de Estados Unidos. Véanse la Carta dirigida al Presidente de Culebra Enterprises Corp. por la Marina de Estados Unidos, Apéndice del apelante, págs. 415–416, y el Informe Núm. 1970-CDC-015, págs. 138–141.

Para principios de la década de los setenta, el Gobierno de Puerto Rico se encomendó a la tarea de delinear la planificación integral de Culebra. Por encomienda del entonces Gobernador, Hon. Luis A. Ferré, dirigida el 17 de noviembre de 1970 a todas las agencias que trataban con el desarrollo de Culebra, y como parte del proceso de planificación ordenada de dicha isla municipio, la Junta de Planificación adoptó el Plano Regulador para la Isla Municipio de Culebra de 1971. La aprobación del plano regulador fue precedida de estudios realizados por técnicos de la Junta de Planificación, en coordinación con otras agencias y con el Gobierno Municipal. La adopción del plano regulador perseguía el propósito de guiar el uso de los terrenos de Culebra y la labor pública y privada tendiente a su desarrollo económico, social y físico. Véanse: Resoluciones

Núms. PR-119 de 5 de mayo de 1971 y PR-77 de 21 de octubre de 1971.

Luego de una intensa controversia interna en el país sobre el uso de Culebra para prácticas militares, en 1972 la zona militar en la isla fue reducida por el Presidente Nixon. Véase *Culebra: A Plan for Conservation and Development*, octubre de 1973 (Informe Conjunto suscrito por el Gobernador de Puerto Rico, Hon. Rafael Hernández Colón, y el Secretario de lo Interior de Estados Unidos, Hon. Roger B. Morton). Caso Núm. Ap-951, Parte IV, Apéndice, pág. 257.

Entre 1973 y 1974, las corporaciones realizaron las segregaciones de sus terrenos en lotes de aproximadamente cinco (5) cuerdas cada uno. Para efectuar las segregaciones, las corporaciones se acogieron al sistema de desvío, con carácter expedito, que disponían los Arts. 3 y 5 del Reglamento de Planificación Núm. 3 vigente a esa fecha. Este mecanismo de dispensa especial aplicaba a *terrenos ubicados en zonas rurales*, cuando la lotificación se hacía *para fines agrícolas*. A tales efectos, *todas las escrituras de segregación dispusieron que ésta se hacía "para fines agrícolas"*. Véase Apéndice de las recurrentes, págs. 417 (Culebra Ent.), 444, 451, 458, 465, 472 (Govan, Inc.), 479, 486, 493, 500, 507, 514, 521, 528, 535 (Navgo, Inc.), 542, 549, 556, 565, 572, 579 y 586 (Vango, Inc.).

Al momento de efectuar dichas segregaciones, no contaban con la aprobación de un proyecto por parte de la Junta de Planificación, pues la consulta que le había sido aprobada en 1969 a Culebra Enterprises Corp. estaba sujeta a determinadas condiciones; tenía una vigencia de seis (6) meses, y ésta nunca fue renovada. Además, para 1973 ya existía el plano regulador, según el cual la mayor parte de los terrenos de las demandantes quedaban sujetos a un propuesto uso agrícola y espacios abiertos. Una ínfima parte de los terrenos, específicamente de Culebra Enterprises Corp., fue clasificada para un propuesto uso residencial-recreativo; sin embargo, en 1974 éste se eliminó con la

intención de evitar el posible desarrollo urbano o residencial en las laderas o lomas que llegan al Puerto del Manglar, por haberse encontrado características bioluminiscentes en sus aguas. Véase la Resolución Núm. PR-77 (primera enmienda) de 3 de diciembre de 1974.

Tras sufrir varias enmiendas, el Plano Regulador de 1971 sirvió de base al Plan de Uso de Terrenos de Culebra y al Mapa de Zonificación, adoptados en 1975, luego del retiro de la Marina de Estados Unidos de la isla de Culebra. Véanse: Resoluciones Núms. PR-77 (tercera extensión) y Z-79, ambas de 13 de agosto de 1975. Como consecuencia de esta última reglamentación, aproximadamente ciento noventa y ocho (198) cuerdas de las pertenecientes a las cuatro (4) corporaciones demandantes, recibieron la clasificación "RO-25-C". Dicha clasificación limitaba el uso de los terrenos a un uso agrícola y requería, además, que las segregaciones tuvieran una cabida mínima de veinticinco (25) cuerdas y una sola residencia. Aproximadamente doscientas ocho (208) cuerdas de los terrenos de las demandantes fueron zonificadas como clasificación "P", la cual implicaba que estos terrenos sólo podrían utilizarse para usos públicos.

En 1977, las corporaciones sometieron de nuevo una consulta de ubicación ante la Junta de Planificación para el desarrollo residencial de sus terrenos. Véase la Consulta Núm. 77-77-B-502-JPU.[5] La Junta de Planificación denegó la consulta porque el desarrollo propuesto no se ajustaba a la densidad dispuesta por el Plan de Uso de Terrenos de Culebra. Véase el Informe Núm. 77-77-JPU-218 de 21 de diciembre de 1977. Luego de solicitar la reconsideración, la Junta de Planificación mantuvo su denegación al concluir que "no se sometió ningún elemento de juicio que sirviera de base para justificar una variación al acuerdo anterior". Véase Informe Núm. 77-77-JPU-218 (segunda

---

[5] En la solicitud de la consulta, las corporaciones no demostraron el daño particular e incautatorio que la zonificación en vigor imponía sobre sus terrenos.

extensión) de 29 de marzo de 1978.([6]) En consecuencia, el proyecto de desarrollo del complejo de residencias veraniegas, ya iniciado por las demandantes, se detuvo.

Dos (2) años después, las corporaciones instaron un pleito en el Tribunal de Distrito federal en contra de los miembros de la Junta de Planificación y de la Autoridad de Desarrollo y Conservación de Culebra, al amparo de la Ley Federal de Derechos Civiles. Finalmente, el 15 de agosto de 1984 se eliminaron las limitaciones al uso de la propiedad en virtud de una estipulación aprobada por dicho foro. La reclamación por daños y perjuicios fue desestimada por prematura, determinación que fue confirmada por el Primer Circuito. Véanse: *Culebra Enterprises Corp. v. Rivera Ríos*, 813 F.2d 506 (1er Cir. 1987); *Culebra Enterprises Corp. v. Rivera Ríos*, 622 F. Supp. 128 (D. P.R. 1985); *Culebra Enterprises Corp. v. Rivera Ríos*, 613 F. Supp. 146 (D. P.R. 1985).

Hacia mediados de 1986, las corporaciones demandaron al Estado Libre Asociado en los tribunales locales. Alegaron que la reglamentación en cuestión constituyó una congelación total de la propiedad, que les privó de todo uso, y que las incautaciones de la Junta de Planificación constituyeron una expropiación temporera sin una compensación justa.([7]) Reclamaron como una compensación justa la suma de setecientos ochenta mil seiscientos ochenta y ocho dólares ($780,688) por los terrenos clasificados "RO-25-C" y un millón trescientos diecinueve mil cuatrocientos setenta y dos dólares ($1,319,472) por los que habían sido zonificados "P".

El entonces Tribunal Superior de Humacao (Hon. Anto-

---

([6]) Vía reconsideración, no trajeron argumento o fundamento adicional alguno que afirmara sus derechos, contrario lo había hecho Culebra Enterprises Corp. en 1969.

([7]) El tribunal de instancia resolvió que, por tratarse realmente de una acción de daños y perjuicios, la acción estaba prescrita. En revisión, este Tribunal revocó dicha determinación y devolvió el caso a instancia para la continuación de los procedimientos. *Culebra Enterprises Corp. v. E.L.A.*, 127 D.P.R. 943 (1991).

nio Amadeo Murga, Juez de la Unidad Especial de Jueces de Apelaciones) resolvió que, con respecto a los terrenos clasificados "RO-25-C", las demandantes no fueron privadas de todo uso económico beneficioso de su propiedad. Aun cuando determinó que el uso agrícola en Culebra era sumamente limitado y que el uso más adecuado del terreno era la construcción de residencias de veraneo, de retiro o segundas residencias para el disfrute de la naturaleza, estimando así que la reglamentación limitó de forma considerable el uso del terreno y con ello afectó su valor, concluyó que, dada la frágil infraestructura de Culebra, los esfuerzos del Estado para evitar un rápido y excesivo desarrollo eran en beneficio del interés público. A su juicio, las demandantes pudieron haber agrupado los predios segregados (de cinco (5) cuerdas cada uno) en fincas de veinticinco (25) cuerdas y así venderlos para los usos que tenían provistos originalmente (recreacional de residencias veraniegas). Por ende, resolvió que no procedía compensar a las corporaciones demandantes por la zonificación "RO-25-C", impuesta a ciento noventa y ocho (198) cuerdas de la totalidad de sus terrenos.[8]

Inconformes, las corporaciones demandantes acudieron ante nos y han señalado que el foro a quo erró al concluir que las ya existentes parcelas de cinco (5) cuerdas, zonificadas "RO-25-C", podían ser agrupadas en parcelas de veinticinco (25) cuerdas y venderse para los mismos usos de recreo dispuestos originalmente. Por su parte, el Procurador General, en esencia, sostiene que los terrenos tenían otros usos productivos. Señala éste que, al exponer el tribunal de instancia la posibilidad de la agrupación de fincas de cinco (5) cuerdas, sólo formula una de las diversas ac-

---

[8] Del total de cuerdas sujetas a la clasificación "RO-25-C", 64.5302 cuerdas pertenecían a Culebra Enterprises Corp., 72.3302 cuerdas pertenecían a Navgo, Inc., 31.991 cuerdas pertenecían a Govan, Inc., y 29.118 cuerdas pertenecían a Vango, Inc. La demanda fue, por lo tanto, desestimada respecto a las corporaciones Navgo, Inc. y Govan, Inc., cuyas propiedades estaban sometidas en su totalidad a dicha clasificación.

ciones que los propietarios pudieron haber activado para lograr otros usos económicamente viables en su propiedad.

En síntesis, el caso de autos requiere que determinemos si la reglamentación especial de zonificación que el Estado implantó para proteger la isla y dirigir su desarrollo de forma coordinada tuvo el efecto de impedir todo uso productivo de las fincas en cuestión. En particular, hay que determinar si la denegación de la consulta de ubicación del proyecto de las corporaciones demandantes constituyó una incautación temporera de sus propiedades sin justa compensación.

Con estos propósitos examinemos inicialmente el derecho aplicable a esta controversia.

## II

La Constitución de Puerto Rico reconoce como derecho fundamental del ser humano el derecho al disfrute de su propiedad.[9] Dicho derecho, sin embargo, no es absoluto y debe ceder ante las necesidades de la comunidad. *Heftler International, Inc. v. J. de P.*, 99 D.P.R. 467, 471 (1970); *E.L.A. v. Márquez*, 93 D.P.R. 393, 401 (1966). Véase, además, *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984). Como parte del poder de razón de Estado, el Gobierno puede regular el uso de terrenos privados en aras de garantizar el orden, la seguridad y el bienestar común y una mejor convivencia social. Constantemente hemos sostenido las facultades del Estado para regular las materias de planificación, uso de terrenos, zonificación y urbanismo por entender que éstas son reglas indispensables para la vida civilizada, especialmente en un país industrial y densamente poblado como el nuestro. Dicho poder, sin embargo,

---

[9] En la Sec. 7 de su Art. II, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 275, dispone, en lo pertinente: "Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. ... Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley". La Quinta Enmienda de la Constitución federal contiene una cláusula similar.

tiene unos límites. Como es sabido, la regulación no puede ser tan excesiva, hasta el grado de privar al dueño de las atribuciones del dominio de la propiedad que le dan valor a ésta.[10]

En casos cuando la legislación rebase tales límites, será obligación del Estado indemnizar al dueño que ha sido privado de dichas atribuciones. Ello es así, pues no resulta justo ni equitativo imponer a unos pocos una carga que debe asumir la comunidad.

Por otro lado, nuestra Constitución también reconoce el poder del Estado para expropiar propiedad privada, siempre y cuando sea para uso público; medie el pago de una justa compensación, y el procedimiento utilizado se ajuste a aquel previsto para ello por ley.[11] Dicho derecho del Gobierno es un atributo inherente y necesario de la soberanía y es superior a todos los derechos de propiedad. *Adm. de Terrenos v. Nerashford Dev. Corp.*, 136 D.P.R. 801 (1994); *E.L.A. v. Registrador*, 111 D.P.R. 117, 119 (1981); *Pueblo v. 632 Metros Cuadrados de Terreno*, 74 D.P.R. 961, 970 (1953).

Si bien no es lo mismo ejercer el poder de expropiar propiedad privada (*eminent domain*) que ejercer el poder de regular el uso de la propiedad privada (*police power*), podrían darse instancias en las que el poder de regulación rebase los límites constitucionalmente permisibles hasta

---

[10] En *The Richards Group v. Junta de Planificación*, 108 D.P.R. 23, 34 (1978), expresamos que "[e]l concepto 'propiedad' no posee un contenido estático". En términos generales explicamos que este concepto ha ido cambiando a través de la historia desde una noción subordinada al logro de la justicia social hasta la idea de que estaba concebido por derechos inmutables prácticamente inmunes al poder del Estado. Íd. Añadimos que "la propiedad en las sociedades democráticas tradicionales entraña determinados derechos, pero que estos viven en competencia continua con otros intereses, privados y públicos, de importancia cambiante y en ocasiones creciente. La extensión de estos derechos y el grado a que tienen que ceder ante otros valores dependen de las circunstancias de cada controversia". Íd., pág. 35.

[11] La Constitución de Puerto Rico establece, en lo pertinente, en su Art. II, Sec. 9, Const. E.L.A., *supra*, pág. 296: "No se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley". Análoga protección incluye la Constitución federal en su Quinta Enmienda.

tener los efectos de una expropiación. En dicho caso, el Estado estaría ejerciendo su poder de dominio eminente por medio de su reglamentación.

La delimitación de los linderos, dentro de los cuales el Estado debe enmarcarse al regular el uso de la propiedad, ha sido una tarea de considerable dificultad para los tribunales. Así lo ha descrito reiteradamente el Tribunal Supremo federal al expresar que no existen reglas rígidas o fórmulas precisas para distinguir entre el poder de expropiación forzosa y el de razón de Estado.[12] *Lucas v. So. Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123–124 (1978);[13] *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962); *United States v. Caltex, Inc.*, 344 U.S. 149, 156 (1952).

Las fronteras del poder de razón de estado las hemos ido demarcando caso a caso, tomando en consideración los hechos particulares en cada uno para sopesar los distintos valores implicados. Véanse: *Hampton Development Corp. v. E.L.A.*, 139 D.P.R. 877 (1996); *Arenas Procesadas, Inc. v. E.L.A.*, 132 D.P.R. 593 (1993); *The Richards Group v. Junta de Planificación*, 108 D.P.R. 23 (1978). Se han identificado, al menos, tres (3) criterios que, de ordinario, se toman en consideración al realizar el balance de intereses, a saber: (1) la naturaleza de la actuación gubernamental; (2) el impacto económico de la reglamentación sobre las personas o entidades afectadas, y (3) si el impacto econó-

---

[12] De hecho, la jurisprudencia sobre el particular ha sido criticada por estar plagada de incertidumbre y arbitrariedad. Véanse: A.L. Peterson, *The Takings Clause: In Search of Underlying Principles*, 77 Cal. L. Rev. 1301 (1989); L. Blume y D.L. Rubinfeld, *Compensation for Takings: An Economic Analysis*, 72 Cal. L. Rev. 569 (1984); J.L. Sax, *Takings and the Police Power*, 74 Yale L.J. 36 (1964).

[13] En *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123–124 (1978), al suscribir la opinión del Tribunal, el Juez Brennan expresó:

"... While this Court has recognized that the 'Fifth Amendment's Guarantee ... [is] designed to bear public burdens which, in all fairness and justice, should be borne by the public as a whole,' *Armstrong v. United States*, 364 U.S. 40, 49 (1960), this Court, quite simply, has been unable to develop any 'set formula' for determining 'when justice and fairness' require that economic injuries caused by public action be compensated by the Government, rather than remain disproportionately concentrated on a few persons."

mico sobre el individuo es menor que el interés protegido por la reglamentación. *Hampton*, supra; *Arenas Procesadas*, supra.

De esta forma se ha requerido una compensación cuando mediante una reglamentación estatal se priva al dueño de todos los usos productivos en su propiedad. *Lucas v. So. Carolina Coastal Council*, supra; *First Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987); *Agins v. Tiburon*, 447 U.S. 255 (1980). En ese sentido, la privación total del uso económico de una propiedad se ha visto como una incautación física por el Estado.

Sin embargo, en los casos de las propiedades afectadas por una zonificación, no se activa este derecho simplemente porque la reglamentación impida el uso óptimo o más productivo de ella. *Arenas Procesadas Inc. v. E.L.A.*, supra. Véanse, además: *Penn Central Transp. Co. v. New York City*, supra, pág. 125; *Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668 (1976); *Goldblatt v. Hempstead*, supra; *Euclid v. Ambler Co.*, 272 U.S. 365 (1926); *Glisson v. Alachua County*, 558 So. 2d 1030, 1035 (1990). Tampoco se activa por el hecho de que la reglamentación tenga el efecto de disminuir el valor de una propiedad. *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470 (1987); *Andrus v. Allard*, 444 U.S. 51 (1979); *Hadacheck v. Los Angeles*, 239 U.S. 394 (1915); 2A *Sackman & Van Brunt, Nichols on Eminent Domain 3d* Sec. 6.16 (1997). A tales efectos, a pesar de la considerable reducción en el valor de la propiedad, en los casos siguientes no se ha considerado que ha habido una incautación: *Euclid*, supra (reducción de 75%); *Hadachek*, supra (reducción de 87.5%); *Pace Resources, Inc. v. Shrewsbury Tp.*, 808 F.2d 1023 (3er Cir. 1987) (disminución de 89.5%); *William C. Haas v. Cty. of San Franciso*, 605 F.2d 1117 (9no Cir. 1979) (disminución de 95%). Este último factor, como vemos, no es decisivo.

De igual forma, la denegación de un permiso solicitado por un propietario no constituye una incautación si éste puede dedicarlo a otro uso razonable. *United States v. Ri-*

*verside Bayview Homes, Inc.*, 474 U.S. 121, 126–127 (1985). Véase, también, *Robinson's, Environmental Regulation of Real Property* Sec. 3.04(2) (1996). En casos en que, luego de denegarse un permiso para un proyecto en particular, no se hayan explorado otros usos disponibles o la obtención de una variación (concesión o dispensa) en aras de promover el aprovechamiento económico de las tierras, se ha considerado que no se trata de una controversia justiciable por no estar lo suficientemente madura. *Williamson Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985); *Hodel v. Virginia Surface Mining & Recl. Assn.*, 452 U.S. 264 (1981); *Agins v. Tiburon*, supra.

Aclarada la normativa aplicable a los casos de incautación mediante reglamentación estatal, examinemos, por otro lado, el Plan de Usos de Terrenos de Culebra que fue el que estableció la zonificación impugnada por las corporaciones demandantes.

## III

Mediante la Ley Núm. 213 de 12 de mayo de 1942, conocida como Ley de Planificación y Presupuesto de Puerto Rico, 23 L.P.R.A. ant. secs. 1-30 y 81-86, se creó la Junta de Planificación y se le encomendó a ésta la preparación de un Plano Regulador para el desarrollo de Puerto Rico y de Planos de Urbanización, de Zonificación y de Uso de Terrenos, entre otros deberes y facultades. Véanse: Arts. 8–10 de la Ley Núm. 213, *supra*, 23 L.P.R.A. ant. secs. 8–10. La Junta de Planificación pasó a ser el organismo gubernamental que estaría encargado de guiar el desarrollo integral de Puerto Rico de modo coordinado, adecuado y económico, para fomentar en la mejor forma el bienestar general de sus habitantes y la eficiencia en el proceso de desarrollo, en la distribución de la población, en el uso de las tierras y en las mejoras públicas. Véase el Art. 3 de la citada Ley Núm. 213 (23 L.P.R.A. ant. sec. 3).

En virtud de la facultad que le fue otorgada por la Ley Núm. 213, *supra*, según enmendada, y por encomienda del

entonces Gobernador, el Hon. Luis A. Ferré, la Junta de Planificación adoptó el Plano Regulador para la Isla Municipio de Culebra en 1971. Ello tenía el propósito de guiar el uso de los terrenos en dicha isla y la labor pública y privada tendente a su desarrollo. Resolución Núm. PR-77 de 21 de octubre de 1971, Junta de Planificación, Santurce. Se dispuso en la introducción de dicho plano lo siguiente:

> ... [H]ay una oportunidad única para orientar el desarrollo de este sector de Puerto Rico en tal forma, que, además de armonizar con las aspiraciones y los recursos del área, no destruya la ecología natural del ambiente al extremo de alterar los encantos que la naturaleza le ha querido generosamente legar. Por eso, el desarrollo de la isla debe llevarse a cabo en forma adecuada, de manera que se preserven sus características naturales únicas y se tomen las medidas pertinentes para que se conserven y utilicen en la forma más cuidadosa, los magníficos arrecifes, las hermosas playas de Resaca, Brava, Larga y Culebrita, Punta Molinos y los lugares pesca de Ensenada Honda y Puerto del Manglar. Plano Regulador de la Isla de Culebra, pág. 3. (Caso Núm. AP-95-1, Parte IV, Apéndice, pág. 120.)

A tenor de dicho plano se disponía la utilización aproximada del 62 por ciento de la isla para la agricultura y de un 6.6 por ciento para un uso residencial recreativo. Plano Regulador, *supra*, pág. 54. Para gran parte del área de Punta Almodóvar y Punta Cabeza de Perro, región —esta última— donde se ubicaban la mayoría de los terrenos de las demandantes, se proponía un uso agrícola. Para una ínfima parte de sus terrenos se propuso el uso residencial recreacional. Los estudios y la información recopilada para la preparación del informe indicaron que la principal empresa de la Isla la constituía la cría de ganado de carne. Íd., pág. 11. A base de ello se concluyó en el informe que en Culebra se estaba aprovechando, más que en otros municipios de la Región Agrícola de San Juan, la utilización de los pastos.

Posteriormente, luego de estudiar el informe preparado en conjunto por técnicos del Departamento de lo Interior de Estados Unidos y por técnicos del Departamento de Recursos Naturales y de la Junta de Planificación, la Junta

enmendó el Plano Regulador. Se eliminó el uso propuesto como residencial recreacional (vacacional) en la mencionada área con la intención de evitar posibles desarrollos urbanos o residenciales en las colinas o pendientes que se extienden hasta Puerto del Manglar, donde se encontraron características bioluminiscentes. Sólo quedaron, entonces, cinco (5) áreas designadas para un uso residencial-vacacional en la Isla. Véase la Resolución Núm. PR-77 (primera enmienda) de 3 de diciembre de 1974.

En el caso de Culebra, el legislador aprobó, además, una ley especial con el propósito de atender las necesidades particulares de esta isla municipio. Mediante la Ley Núm. 66 de 22 de junio de 1975, conocida como la Ley de Conservación y Desarrollo de Culebra, 21 L.P.R.A. secs. 890–890*l*, se creó un organismo dedicado a la conservación, uso y desarrollo integral de Culebra, el cual estaría adscrito al Departamento de Recursos Naturales.[14] La Autoridad de Conservación y Desarrollo de Culebra se encargaría de implantar la política pública plasmada en dicha ley,[15] la cual quedó resumida en el Art. 2 de la forma siguiente:

> Se declara que es política pública del Estado Libre Asociado de Puerto Rico preservar y conservar la integridad ecológica de Culebra, incluyendo sus cayos, islas y aguas circundantes y

---

[14] En su Art. 6, la Ley Núm. 66 de 22 de junio de 1975 dispone, en lo pertinente, que: "[n]inguna agencia aprobará obra o proyecto privado alguno en relación con la Isla de Culebra que conflija con los planes y políticas formuladas y adoptadas por la Autoridad." 21 L.P.R.A. sec. 890e. En virtud del Art. 5 de la ley, la Autoridad de Conservación y Desarrollo de Culebra (en adelante la Autoridad) aprobó en julio de 1976 el Plan de Manejo de Culebra. Para implantar y cumplir con la citada disposición del citado Art. 6 se estableció en el Plan de Manejo que los permisos que involucraran al Municipio de Culebra se tramitarían conforme al trámite ordinario. Sin embargo, luego de sometida una consulta a la Administración de Reglamentos y Permisos (A.R.Pe.), trámite seguido actualmente ante la Junta de Planificación, esta agencia consultaría a la Autoridad de Conservación y Desarrollo de Culebra, para su endoso, antes de aprobar o denegar la consulta. Plan de Uso, *supra*, pág. 56.

[15] En la formulación del Plan de Manejo, la Autoridad perseguía precisamente la implantación de la política pública plasmada en la Ley Núm. 66, *supra*, 21 L.P.R.A. secs. 890–890*l*, en armonía con el Informe Conjunto firmado por el Gobernador de Puerto Rico, Hon. Rafael Hernández Colón, y el Secretario de lo Interior de Estados Unidos, Hon. Roger B. Morton, el 29 de octubre de 1973. De esta forma se demarcaron en Culebra cuatro áreas principales y se propusieron los usos de terreno siguientes: (1) vida silvestre y refugios naturales: (2) recreación; (3) conservación, y (4) desarrollo. Plan de Manejo, *supra*, págs. 1–6.

asegurar que el continuo desarrollo de Culebra proteja y conserve, al máximo, su extraordinario ambiente natural que es parte del patrimonio de Puerto Rico. A estos fines, es propio que exista un organismo dedicado a la conservación y desarrollo integral de Culebra mediante todos los medios adecuados, incluyendo, pero sin limitarse, al establecimiento de planes de administración, reglas y reglamentos, la posesión y manejo de terrenos de dominio público, infraestructuras y estructuras adecuadas para el establecimiento y ejecución de programas que propendan al mejor conocimiento, preservación y sabio uso de los recursos naturales de Culebra. 21 L.P.R.A. sec. 890a.

En conformidad con la nueva ley de planificación, aprobada también en 1975 con el propósito de ampliar aún más la autoridad de la Junta,([16]) ese mismo año la Junta aprobó nuevas enmiendas al Plano Regulador de Culebra. Cambió su título para que en lo sucesivo se conociera como el "Plan de Uso de Terrenos para el Municipio de Culebra". En lo sustantivo, enmendó el plan vial para eliminar la propuesta construcción de vías rurales en el sector oriental de la isla y en el sector Flamenco, y la propuesta de uso vacacional, y eliminó para tal uso el sector residencial vacacional al este de la isla y frente a la Bahía Almodóvar. Véase la Resolución Núm. PR-77 (segunda enmienda) de 13 de agosto de 1975.

En esa misma fecha se aprobó y adoptó, además, el Mapa de Zonificación de Culebra, utilizando como guía el Plano Regulador (en ese momento, Plan de Usos de Terrenos) y en armonía con las disposiciones de la Ley de Conservación y Desarrollo de Culebra. Véanse: Resoluciones

---

([16]) Ley Núm. 75 de 24 de junio de 1975, conocida como la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 62 *et seq.* La nueva ley concedió mayor autoridad a la Junta para preparar, adoptar y enmendar conceptos de desarrollo y utilización de terrenos para áreas urbanas, suburbanas y rurales, y así también adoptar reglamentos para fijar el uso y desarrollo de los terrenos y edificaciones por zonas y distritos. El Art. 14 de dicha Ley Núm. 75 (23 L.P.R.A. sec. 62m), dispone en cuanto a la preparación y adopción de Planes de Uso de Terrenos que:

"... [D]ependiendo de si son planes de desarrollo regional, urbano, rural, municipal o dependiendo de su alcance geográfico, [la Junta] designar[á] la distribución, localización, extensión, e intensidad de los usos de los terrenos para propósitos urbanos, rurales, agrícolas, de explotación minera, bosques, conservación y protección de los recursos naturales, recreación, transportación y comunicaciones, generación de energía, y para actividades residenciales, comerciales, industriales, educativas, públicas e institucionales."

Núms. PR-77 (tercera extensión) y Z-79 de 13 de agosto de 1975. En el Mapa de Zonificación se designaron ciertas áreas especiales dentro de los distritos residenciales de baja densidad ("R-0"). La Junta estableció que los casos que surgieran en los distritos "R-0" reunían las características especiales para que fueran considerados casos especiales, conforme a la Sec. 10.19 del Reglamento de Planificación Núm. 4 de 16 de septiembre de 1992 (Reglamento de Zonificación) Junta de Planificación, págs. 62–63, la Resolución Núm. JP-215 (primera extensión) de 13 de agosto de 1975, y que los casos de lotificaciones simples que surgieran en dichas áreas también fueran considerados casos especiales en virtud del Art. 8 del Reglamento de Planificación Núm. 11 (Reglamento de Lotificaciones Simples), Oficina del Gobernador, 22 de noviembre de 1965, pág. 5; Resolución Núm. JP-216 de 13 de agosto de 1975.

Los referidos distritos, clasificados con el prefijo R-0, persiguen el propósito de facilitar la dirección y el control del desarrollo del Municipio de Culebra, de proteger varias áreas naturales únicas y de conservar sus áreas agrícolas. Véase la Resolución Núm. JP-215-A de 13 de agosto de 1975 (Normas para regir los casos especiales que surjan en las áreas especiales establecidas en los distritos residenciales de baja densidad (R-0) en el Municipio de Culebra). Por su parte, la designación de ciertas áreas con el sufijo 25-C perseguía el propósito de conservar el paisaje natural y/o el carácter agrícola del interior del Municipio de Culebra. Art. 6.00 de la Resolución Núm. JP-215-A de 13 de agosto de 1975, Junta de Planificación, pág. 3-1.

En particular, con respecto a las áreas 25-C se estipuló que los terrenos o edificios ubicados en ellas podrían utilizarse para: (1) uso agrícola, lo cual incluye siembra y cosecha de productos agrícolas y pastos para ganado, la edificación de estructuras para polleras, almacenes y otras estructuras necesarias para el proceso y almacenaje de productos agropecuarios; (2) casas de una o dos familias que sirvan de residencia principal para las personas directamente relacionadas con el uso agrícola de los terrenos, y

(3) hoteles de turismo cuya ubicación sea autorizada por la Junta de Planificación, conforme a las recomendaciones del Plan de Usos de Terrenos. Art. 7 de la Resolución Núm. JP-215-A, *supra*, pág. 3–1.

En cuanto al tamaño del solar, se especifica que el mínimo sería veinticinco (25) cuerdas y que dicho mínimo aplicaría a "todo solar a formarse con posterioridad a la vigencia de estas normas". Art. 9 de la Resolución Núm. JP-215-A, *supra*, pág. 3-2.

Vista la legislación y reglamentación estatal aplicable a los terrenos de las demandantes hasta 1984, examinemos si al zonificarse parte de sus terrenos como áreas "RO-25-C" y, posteriormente, denegárseles la ubicación del proyecto residencial vacacional por no ajustarse a la densidad prevista para el área, se impidió todo uso productivo en sus terrenos, configurándose con ello una incautación o congelación temporera de los terrenos sin justa compensación.

## IV

En primer lugar, como vimos, en la situación particular de Culebra el Poder Ejecutivo, en el válido ejercicio de su poder y a través de las agencias pertinentes, determinó fomentar el uso agrícola de una región. Recordemos que reiteradamente hemos sostenido que regular la planificación y el uso de los terrenos es una facultad esencial e importantísima del Estado. Dicho poder fue utilizado de forma razonable y acorde con la política pública adoptada por la Asamblea Legislativa.

Hoy la mayoría de este Tribunal, tomando en consideración que las ciento noventa y ocho (198) cuerdas que fueron afectadas por la clasificación "RO-25-C" alegadamente no sirven para el uso al que fueron designadas mediante reglamentación estatal, sostiene que las restricciones impuestas por dicha clasificación impidieron todo uso productivo sobre este terreno. Increíblemente, con la prueba pericial que obraba en autos (únicamente de la parte demandante), la mayoría descartó de un plumazo lo que tomó

años a la Junta de Planificación, luego de un sinnúmero de estudios e informes sometidos a distintas entidades gubernamentales. La conjugación de los diversos factores geográficos y geológicos implicados "ineludiblemente" llevó a la mayoría a concluir que la actividad agrícola en Culebra es casi inexistente, por lo que "le resultó evidente" que la clasificación "RO-25-C" tuvo el efecto inmediato de obligar a conservar los terrenos en su estado natural.

Previamente esbozamos los usos permitidos por la clasificación "RO-25-C" y, como pudo apreciarse, ésta permitía ciertos usos productivos. En primer término, tanto las demandantes como la opinión mayoritaria tienen una conceptualización muy limitada y restringida de los que es y comprende el término "agricultura". La agricultura abarca una gran cantidad de actividades. A tales efectos, conviene mencionar la definición que ofrece la Ley de la Corporación para el Desarrollo Agrícola de Puerto Rico, Ley Núm. 62 de 30 de mayo de 1973 (5 L.P.R.A. ant. sec. 1801 *et seq.*) del término "producto agrícola":

> ... Todo producto de Puerto Rico que se obtiene del ejercicio de la agricultura y las industrias pecuarias en todas sus ramas, incluyendo la apicultura y la avicultura, y todos los productos derivados de cualquiera de las referidas actividades bien sean frescos o en cualquier forma de elaboración o conservación. Este término incluirá también los productos de la pesca de agua dulce o del mar o de la acuacultura. 5 L.P.R.A. sec. 1802(d) (Sup. 1980).

Argumentar que la zonificación "RO-25-C" impone en la práctica las mismas restricciones que una clasificación "P" equivale a desvirtuar la pericia de la agencia gubernamental encargada de la planificación mediante reglamentación del desarrollo y uso de las tierras en el País, así como de las distintas entidades especializadas que sometieron sus respectivas posiciones y recomendaciones luego de realizados los estudios pertinentes en Culebra. Constituye, además, una negación de la historia de este municipio, en tanto y en cuanto se ignora que antes de, y aun durante, la presencia de la Marina norteamericana en la isla, sus te-

rrenos habían sido dedicados en gran medida a la crianza de ganado.([17]) La ganadería fue una actividad que sostuvieron los culebrenses durante gran parte de su historia, incluso fue su principal actividad durante un tiempo, y todavía la sostienen sin que ello menoscabe la opción de expandir actividades y realizar otras faenas agrícolas y agropecuarias. Aun cuando pueda argumentarse que el uso agrícola de los terrenos en Culebra es limitado, ese es un planteamiento que habrá de dilucidarse ante el foro encargado de la planificación en el país, foro que anteriormente tomó la decisión de fomentar la agricultura en dicha zona.

Al comparar a Culebra con el resto de Puerto Rico se olvida de que fue, precisamente, por las diferencias que existen entre ambos que tanto el Gobernador, a través de las agencias administrativas concernidas, como la Asamblea Legislativa, mediante la Ley Núm. 66, *supra*, decidieron dar un trato particular al desarrollo de Culebra.([18])

Además, tal como hemos advertido en otras ocasiones, el Estado puede imponer regulaciones más rigurosas cuando se trata del desarrollo y uso de propiedades costeras, debido a sus frágiles y únicos ecosistemas.([19]) Este fue

---

([17]) En efecto, la presencia de la Marina, con sus consabidas prácticas de ejercicios militares al igual que sus restricciones a la transportación marítima y aérea, fue la causa principal de la merma y desaparición de la industria ganadera a nivel comercial en dicha isla.

([18]) De hecho al aprobar y adoptar el Mapa de Zonificación para el Municipio de Culebra, se estableció lo siguiente:

"La Isla de Culebra y las pequeñas islas y cayos que componen el Municipio, tienen unas características peculiares, tanto de naturaleza histórica, socio-económica, así como física y natural, que la hacen única en la región del Caribe.

"Su litoral costero está bordeado de aguas cristalinas, playas de arena blanca, manglares bosques y arrecifes de corales. Este pequeño archipiélago es rico en paisajes y contrastes naturales, tales como su área rocosa, con piedras de gran tamaño y forma peculiar, su gran variedad de árboles, sus lagunas, su excelente clima y colinas de moderada elevación." Resolución Núm. Z-79 de 13 de agosto de 1975, Junta de Planificación, pág. 1.

([19]) Como vimos, es la Junta de Planificación quien tiene la facultad y la responsabilidad de dirigir y controlar el crecimiento y desarrollo urbano, suburbano y rural de los municipios de Puerto Rico, tomando en consideración, entre otros factores, la selección de terrenos más adecuados para tal desarrollo y la conservación de zonas agrícolas en los municipios. Con esas palabras la propia Junta de Planificación describió su deber en la Resolución Núm. JP-215 (primera extensión) de 13 de agosto de 1975, Junta de Planificación, pág. 2, y añadió:

también el caso de Culebra, específicamente cuando en 1974 se alteró el uso propuesto residencial recreativo de dos (2) pequeñas áreas que daban al Puerto del Manglar, por haberse encontrado en sus aguas características bioluminiscentes.

En este sentido, la amplitud del proyecto de las corporaciones demandantes y su ubicación, próximo a manglares y a una bahía fosforescente, implicaba violar la política pública que inspiró la reglamentación y tendría un impacto significativo en la densidad poblacional de la zona, lo cual requería que se creara una infraestructura que en aquellos momentos Culebra no tenía disponible.

En segundo término, este es un caso en el que la parte que alega que la reglamentación de zonificación le privó de todos los usos productivos de su propiedad se aprovechó de dicha zonificación tanto como pudo. Tras beneficiarse de la reglamentación, pretende impugnarla. Tal como surge de los hechos descritos anteriormente, al momento en que las corporaciones demandantes adquirieron los terrenos en cuestión, Culebra se encontraba en su momento histórico de mayor restricción por parte de la Marina de Estados Unidos. Claramente los terrenos fueron comprados por las corporaciones demandantes con conocimiento de estas limitaciones sobre el desarrollo de la isla. Ciertamente, según la situación descrita, el desarrollo residencial recreativo previsto para esos terrenos era, en ese momento, imposible y eso lo sabían las corporaciones y sus inversionistas.

En 1971, antes del desalojo de la Marina, el Plano Regulador de Culebra disponía un uso agrícola para la mayor parte de la isla, siendo afectada por dicha propuesta una porción significativa de los terrenos de las demandantes. A pesar de lo anterior, las corporaciones no intentaron de

---

"La Junta de Planificación de Puerto Rico tiene la responsabilidad ineludible de preservar, conservar y proteger las escasas áreas naturales de Puerto Rico para el disfrute de la presente y futuras generaciones, como también tiene la responsabilidad de velar por la protección de parajes de excepcional belleza y evitar desarrollos aislados que deterioren o destruyan esa belleza."

nuevo la aprobación de la consulta de ubicación de su proyecto de residencias veraniegas. Todo lo contrario, adoptaron el uso agrícola de sus terrenos, antes de que éste fuera impuesto por el Estado, para beneficiarse del mecanismo de exención a las disposiciones del Reglamento de Lotificación, entonces vigente, aplicable únicamente a terrenos ubicados en zonas rurales. Por eso consignaron en todas las escrituras de segregación que las lotificaciones se hacían para fines agrícolas.

Si las corporaciones demandantes en realidad jamás realmente quisieron dedicar sus terrenos al uso agrícola, ¿por qué lo adoptaron para sus terrenos? La única razón que encontramos para ello, acorde con el ordenamiento vigente en aquel momento, fue el evitar el cedazo de la agencia encargada de implementar la política pública encarnada en las Resoluciones Núm. PR-119 de 5 de mayo de 1971 y Núm. PR-77 de 21 de octubre de 1971, que durante esos años recomendaba un uso agrícola para la mayor parte de los terrenos de las corporaciones y un uso residencial recreativo para una ínfima parte de los terrenos en cuestión. Dichas resoluciones debían servir de guías para la evaluación de propuestas sobre segregaciones y proyectos privados para Culebra. Obviamente las corporaciones evadieron el examen minucioso de la Junta de Planificación.

No obstante, éstas pretenden, convenientemente, años después de haber efectuado las segregaciones para fines agrícolas, que resolvamos que sus terrenos no eran aptos para la actividad agrícola, por lo que la zonificación establecida por el Estado implicó un uso nulo e imposible de las tierras en cuestión. La mayoría del Tribunal se dejó convencer por sus argumentos. Olvidaron que durante los años en que la reglamentación especial limitó el uso de los terrenos a la agricultura, esa era una actividad económica que el Estado legítimamente tenía interés en estimular.

Por otro lado, resulta sorprendente que las corporaciones no activaran los recursos procesales y sustantivos que ofrecen los reglamentos de planificación para promover el

uso legal de sus terrenos. A tales efectos, no intentaron obtener una dispensa o variación,[20] una excepción o un uso no conforme legal, entre otros mecanismos diseñados para minimizar el impacto confiscatorio de la reglamentación estatal. Además, como a las corporaciones no les aplicaba el mínimo de cuerdas por solar —veinticinco (25)— que fue establecido por la reglamentación, puesto que habían verificado las segregaciones antes de la aprobación de la reglamentación, lo razonable era que surgieran dudas con respecto a cómo la zonificación afectaría sus terrenos. En dicho caso, la reglamentación vigente proveía el mecanismo de solicitudes de interpretación reglamentaria. Sin embargo, ninguno de estos mecanismos fue utilizado por las corporaciones demandantes.

En cuanto al impacto económico que tuvo la reglamentación en cuestión sobre las corporaciones, consideremos la disminución en el valor de la propiedad que se alega causó la limitación en el uso. Las ciento noventa y ocho (198) cuerdas de las corporaciones demandantes fueron estimadas con un valor en el mercado de un millón quinientos once mil ciento veinticuatro dólares ($1,511,124) antes de la reglamentación. Sentencia recurrida, págs. 16–17. Después de la zonificación que las clasificó como distritos "RO-25-C", su valor se redujo a doscientos treinta y seis mil trescientos ochenta y cinco dólares ($236,385), lo cual refleja una disminución de un 84.36 por ciento del valor en el mercado previo a la zonificación. Íd. La disminución en valor ocurrida en el período en cuestión no nos lleva per se a concluir que ocurrió una incautación reglamentaria temporal. Como vimos anteriormente, éste es sólo un fac-

---

[20] Como es sabido, el mecanismo de dispensas brinda flexibilidad en la aplicación de los diversos reglamentos sirviendo de instrumento de ajuste de los intereses en conflicto entre el dueño y el interés público. Por un lado, el dueño busca preservar y maximizar la utilidad de sus terrenos, y por otro, el interés público intenta controlar el uso de la tierra y promover un desarrollo urbano y rural integral, racional y ordenado. Véase *Asoc. Res. Baldrich, Inc. v. J.P. de P.R.*, 118 D.P.R. 759, 768 (1987).

tor que se debe considerar y que no se considera decisivo.([21])

En conclusión, claramente, la zonificación en cuestión no constituye el tipo de reglamentación del uso de los terrenos que rebasa los limites permisibles. Las demandantes, incluso, se aprovecharon de ella antes de impugnarla. El hecho de que no se permitiera explotar unos terrenos de la manera en que mayor rendimiento produjera no significa que se negara su utilización para otros usos. Existían otros usos productivos acordes con la reglamentación, además de mecanismos para intentar obtener el uso proyectado.

## V

No procede, a nuestro juicio, la compensación por no haberse privado de todo uso económico de los terrenos sujetos a la clasificación "RO-25-C", puesto que dicha clasificación no constituye una incautación reglamentaria. Al decidir lo contrario, la mayoría priva al Estado de uno de los poderes que tradicionalmente ha ostentado: el de pautar el desarrollo de los terrenos sujetos a su jurisdicción de una manera coordinada e integral. Se olvida muy fácilmente la mayoría de que el uso ideal proyectado por una entidad privada para un terreno no necesariamente está acorde con la política pública establecida por el Estado.

Aunque por las razones anteriormente expuestas disentimos con relación a los terrenos clasificados como distritos "RO-25-C", en lo que respecta a los terrenos sujetos a la zonificación "P", coincidimos con la opinión mayoritaria en

---

([21]) El hecho de que la reglamentación sobre el uso de la tierra haya causado una disminución en el valor de la propiedad no significa que se haya configurado una incautación. Recordemos que en *Lucas v. So. Carolina Coastal Council*, 505 U.S. 1003 (1992), específicamente se determinó que la reglamentación impugnada había causado que las parcelas de terreno del demandante *no tuvieran valor alguno*. En esas circunstancias, en que se privó a un dueño de *todo uso económico* de su tierra, fue que determinó el Tribunal Supremo federal que no hacía falta considerar si la reglamentación estatal en cuestión adelantaba o no un fin estatal legítimo.

que debe devolverse al foro de instancia. Aun cuando este Tribunal podría aclarar en esta ocasión lo que se considerará "justa compensación" en casos en que proceda su pago por haberse determinado que una reglamentación estatal haya privado temporeramente a un dueño de todo uso productivo de su propiedad, dados los hechos y el trasfondo procesal particulares de este caso, no estimamos prudente pautar cómo se valorará la "justa compensación". En conformidad con lo anterior, devolveríamos para calcular únicamente la compensación que proceda por la incautación de los terrenos sujetos a la clasificación "P".