Opinión disidente emitida por
la Jueza Asociada Señora Fiol Matta,
a la cual se une la Juez Asociada Señora Rodríguez Rodríguez.
Escribo esta opinión con gran preocupación ante la idea del “poder del silencio” que ha acogido una mayoría de este Tribunal, especialmente cuando se trata de interpretar asuntos de suma importancia en nuestro derecho constitu-cional, en este caso, el proceso mismo para enmendar nues-tra Ley Suprema. Nunca podemos olvidar que, en nuestro ordenamiento constitucional democrático, todo poder tiene límites. ([1]) En ese sentido y para preservar nuestras profun-das raíces democráticas, no debemos alejarnos de la idea de que “[p]or encima del Poder [está] el derecho”.([2])
Estoy de acuerdo con las conclusiones de la opinión ma-yoritaria en cuanto a que nos encontramos ante una con- *78 troversia justiciable, que el Partido Independentista Puer-torriqueño (PIP) tiene legitimación para presentar este caso y que no incurrió en incuria. También comparto el criterio de que la Resolución Concurrente Número 35, que propuso celebrar un referéndum para enmendar la Consti-tución de Puerto Rico alterando la composición de la Legis-latura, no contó con los votos que el texto constitucional requiere para su aprobación. Sin embargo, difiero del aná-lisis que emplea la mayoría para resolver que el aval legis-lativo a la Resolución Concurrente Número 60, que pro-puso consultarle al Pueblo en un referéndum si consiente restringir el derecho a la fianza, tuvo el efecto de aprobar la Resolución 35 con solo mencionarla. En este aspecto, coincido con la opinión disidente emitida por el Juez Pre-sidente Hernández Denton. Ciertamente, las deficiencias serias e irremediables en el proceso llevado a cabo por la Asamblea Legislativa para dar paso al referéndum que permitiría enmendar la Constitución y la falta de rigurosi-dad demostrada por ese cuerpo en el desempeño de sus facultades requieren que el Tribunal Supremo, en el ejer-cicio de su responsabilidad constitucional, invalide la ac-tuación legislativa por apartarse de las exigencias conteni-das en nuestra Ley Suprema y en los reglamentos legislativos.
Más allá de esas determinaciones y sus fundamentos, entiendo necesario expresarme separadamente sobre el pe-ligroso razonamiento que exhibe, en múltiples ocasiones y con certeza de convicción, la opinión que hoy emite una mayoría del Tribunal. La frase “nada impide” que ésta re-pite constantemente es una señal de alarma. La opinión mayoritaria presenta una visión preocupante sobre la inte-racción entre el poder gubernamental y las protecciones constitucionales al concluir que, si la Constitución no pro-híbe una acción particular de manera expresa, no hay lími-tes al ejercicio del poder.
*79 En esta ocasión, esa visión toma forma en la conclusión del Tribunal de que basta con que la Asamblea Legislativa cumpla parcialmente con el riguroso proceso para enmen-dar nuestra Constitución, sin importar cuán accidentado, escabroso, torpe o irresponsable haya sido, para que sea validado por los tribunales. La mayoría está profunda-mente equivocada: en lo que concierne a la Constitución, no basta con llegar al destino; igual de importante es revi-sar cómo se llegó.
Es cierto que el proceso para enmendar la Constitución, como lo describe la opinión mayoritaria, es "particularmen-te detallado y definido’.([3]) Pero no por eso la ausencia de algún detalle es sinónimo de una carta blanca. La falta de definición de cierto aspecto del proceso no equivale a un consentimiento para delinear ese punto como mejor con-venga en una situación particular. Y es aquí que encontra-mos dos fallas fundamentales de la Opinión del Tribunal. En primer lugar, concluye erróneamente que ese detalle y esa definición relevan al Tribunal de su rol interpretativo como si se tratara únicamente de la aplicación mecánica de un proceso totalmente particularizado. En segundo lugar, justifica su metodología de buscar únicamente lo prohibido expresamente. Con toda honestidad, ninguna de estas con-clusiones me parece válida. Nuestra Constitución no es un mapa exacto. Por el contrario, ofrece coordenadas. La opi-nión mayoritaria ignora esto. Por eso, utiliza la inclusión de mandatos específicos en el texto constitucional como una excusa para concluir que este Tribunal no tiene nada que interpretar, cancelando así nuestro rol constitucional, y que la ausencia de una prohibición expresa equivale a una autorización.
La opinión mayoritaria revela la noción de que la Cons-titución supone solamente los límites del poder *80 gubernamental. Nada más lejos de la verdad. La Constitu-ción, además de establecer límites, es la fuente del poder gubernamental.([4]) Por lo tanto, no debemos recurrir a la Constitución únicamente para encontrar lo que no se puede hacer. La Constitución permite el ejercicio del poder y, en ciertas ocasiones, como la de autos, establece cómo debe ejercerse ese poder, cuál será el proceso. Es especial-mente preocupante la insistencia de la opinión mayoritaria en que no existen prohibiciones expresas y detalladas en la Constitución que se violen por el proceso accidentado lle-vado a cabo por la Asamblea Legislativa y en que eso es suficiente para validarlo. Parecería que, si la Constitución no lo prohíbe expresamente, “anything goes”.([5]) Esto es *81 particularmente alarmante cuando se trata de posibles al-teraciones al texto constitucional. Precisamente, en Berríos Martínez v. Gobernador II, rechazamos esa visión en el contexto específico de las enmiendas a la Constitución: “También partimos de la premisa que, en el ejercicio de su poder soberano, el pueblo incluyó en el Art. VII de la Constitución, supra, unos límites expresos e implícitos sobre el alcance de las enmiendas que se podrán incorporar”.([6]) Es nuestro deber, como intérpretes de la Constitución, encontrarlos. La mayoría del Tribunal hace lo contrario.
La opinión mayoritaria indica que “nada impide que el Senado de Puerto Rico, mediante una Resolución Concu-rrente posterior, reitere lo hecho en una [Resolución Concurrente] anterior”.([7]) Esto, para resolver que la Resolución 60, a través de la frase en la que alude a lo dicho en la Resolución 35, incluyó todo el contenido de la Resolución 35 y se le presentó a la Legislatura para que avalara el referéndum sobre la reforma legislativa que no había obte-nido los votos necesarios anteriormente. Asimismo, señala que su interpretación es cónsona con la Constitución por el simple hecho de que la Constitución “guarda silencio en cuanto a la definición de las Resoluciones Concurrentes”.([8]) Ello le parece suficiente para concluir que una resolución concurrente que propone enmendar la Constitución se puede aprobar a través de otra resolución concurrente aprobada con un propósito totalmente desvinculado solo porque la segunda menciona la primera. Su argumento es que “[l]os padres de la Constitución no impusieron ese re-quisito [de seguir el mismo trámite y diseño temático que los proyectos de ley] a la resolución concurrente, por lo cual no debe imponerlo este Tribunal...”.([9]) Aprovechar la *82 ausencia de una expresión para construir un significado que resulta poco probable y acomodaticio no me parece el mejor método de análisis que este Tribunal podría emplear.([10])
Este recurso a los “silencios” de la Constitución socava otras determinaciones significativas de la opinión. Así, con el fin de concluir que la publicación de la propuesta de enmienda constitucional se hizo correctamente, la opinión del Tribunal alude a que el historial de la Convención Constituyente “guarda silencio” en cuanto a cómo debe ser la publicación requerida.([11]) De igual manera, para decidir que la naturaleza temporera de la Junta Constitucional Revisora de Distritos Senatoriales y Representativos y su disolución después de cada división decenal no es un impe-dimento para que se pueda convocar a la Junta fuera de los plazos fijados, la opinión mayoritaria señala que “[n]o he-mos encontrado nada en el texto de la Constitución ni en el *83 historial de la Convención Constituyente que prohíba el que la Junta Constitucional Revisora de Distritos Legisla-tivos sea convocada en más de una ocasión en una década” y, “[p]or ende, no existe prohibición constitucional alguna que impida que la Junta sea convocada para realizar una revisión de los distritos legislativos en medio de una dé-cada ...”.([12]) Nuevamente, en lugar de fijarse en los límites que conlleva lo que la Constitución expresa, busca autori-zaciones en el silencio.
Por otro lado, la opinión mayoritaria indica que le pa-rece simplista el argumento del PIP de que cada compo-nente de la reforma legislativa conlleva enmendar una parte de la Constitución. A pesar de que reconoce que “[u]n referéndum que propone al Pueblo una serie de enmiendas a su [ley superior] es un evento complejo, sensitivo y alta-mente regulado” que, además, conlleva un desembolso sus-tancial de fondos públicos,([13]) la opinión mayoritaria pro-pone un análisis mecánico de los requisitos de separabilidad y cantidad de las propuestas de enmienda constitucional.([14]) A partir de éste, determina que no es ne-cesario que los legisladores hagan sus propuestas de ma-nera que los electores puedan entender por qué están vo-tando, porque la Constitución no contiene un requisito expreso en cuanto a esto.([15]) Según la mayoría del Tribunal, exigirle a la Legislatura más responsabilidad que la esta-blecida expresamente en la Constitución sería una “burla” a nuestro sistema constitucional democrático, pero no lo sería proponer urna consulta al Pueblo para enmendar su constitución a través de un proceso plagado de errores.([16])
Constantemente, la opinión mayoritaria enfatiza la au-sencia de limitaciones expresas a lo hecho por la Asamblea *84 Legislativa. Sin embargo, no atiende otro asunto fundamental: si lo que hizo la Asamblea Legislativa estaba au-torizado constitucionalmente.([17]) Este enfoque es alta-mente preocupante, pues revela una falta de entendi-miento sobre el rol de nuestra Constitución en el ordena-miento democrático puertorriqueño. Tal parece que la ma-yoría ve en nuestra Ley Suprema una lista de obstáculos molestosos al poder de las ramas políticas que deben ser aplicados únicamente cuando ha habido una violación se-vera de sus disposiciones. Pero nuestra Constitución no es un estorbo. Por el contrario, es lo que permite nuestra vida en sociedad, garantiza nuestras libertades y establece una dirección colectiva hacia el país que queremos: más justo, más democrático, más social, más humano. En ese sentido, a veces son las propias ramas políticas las que obstaculi-zan el diseño constitucional y por eso existe la revisión judicial, para reivindicar el mandato constitucional cuando las demás ramas violan, ignoran o minimizan sus disposiciones.([18]) Como resolvimos en Silva v. Hernández *85 Agosto, “[njuestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos”.([19])
Cabe preguntarse qué quedaría del rol interpretativo de este Tribunal si lo único que importa es averiguar si la Constitución contiene una prohibición expresa a alguna ac-tuación gubernamental en particular. De ser ese el están-dar, no habría nada que interpretar; solo habría que apli-car lo dispuesto expresamente. En ese caso, quedarían seriamente debilitados los conceptos revisión judicial e in-terpretación constitucional y la facultad de esta curia para determinar que una actuación de otra rama de gobierno es inconstitucional. ([20])
Sin revisión judicial, la observancia de los mandatos de la Constitución quedaría al arbitrio y la conveniencia de las ramas políticas. De igual forma, si los tribunales abdi-can su responsabilidad de exigir que las demás ramas ac-túen en conformidad rigurosa con la Constitución, corre-mos el riesgo de que las ramas políticas concluyan que su poder cada vez tiene menos límites. Así no se enmiendan las constituciones. Así no cumplimos con nuestra función judicial. Al contrario, nos alejamos de la función constitu-cional que la opinión mayoritaria identifica como la razón principal por la cual este Tribunal fue creado. ([21])
*86 Lo anterior cobra mayor relevancia cuando la Constitu-ción que garantiza los derechos individuales y colectivos del Pueblo es la que requiere nuestra protección. Típica-mente, la víctima del abuso del poder gubernamental es un individuo o un grupo social marginado. Ya sea cuando a un acusado se le prohíbe tener un abogado, a un obrero se le castiga por participar en alguna actividad concertada, a un ciudadano se le multa por poner un pasquín en un poste o a una minoría religiosa se le intimida en su culto, la Cons-titución interviene como escudo para proteger los derechos que ella misma reconoce. Ahora bien, ¿qué ocurre cuando la víctima del abuso de poder gubernamental no es un in-dividuo o un grupo sino la propia Constitución? En esos casos, la Constitución no puede protegerse sola; requiere la intervención de los tribunales.
La opinión señala que “ante la trascendental importan-cia de un documento constitucional, [es necesario que] el procedimiento para enmendarlo sea particularmente deta-llado y definido”,([22]) que limite el proceso de tal manera que no sea tan fácil aprobar enmiendas constantemente para que se pueda mantener la coherencia del texto constitucio-nal y protegerlo de los caprichos momentáneos de las mayorías.([23]) Esas premisas son correctas y coincido con la mayoría en que esos principios propician que nuestra cons-titución sea fuerte y estable. Por eso, me sorprende tanto que la Jueza y los Jueces que suscriben la opinión del Tribunal recurran al planteamiento de que las acciones que se validan en esta resolución están permitidas porque la Constitución no las prohíbe expresamente.
Llama la atención que, por un lado, la opinión mayori-taria afirma que, “por su evidente importancia, las Consti- *87 tuciones no pueden ser enmendadas como si fueran cual-quier otro estatuto”([24]) pero, por otro lado, recurre al hecho de que no hay requisitos expresos sobre la manera de tra-mitar una resolución concurrente para concluir que tene-mos que ser más laxos con el proceso de aprobación de las resoluciones concurrentes que sientan las bases para en-mendar la Constitución([25]) Así, manifiesta que los tribuna-les deben ser flexibles al estudiar si la Legislatura ha cum-plido con las exigencias del procedimiento constitucional para aprobar leyes; esto con el fin de no convertirse en un obstáculo o un impedimento para el proceso legislativo. Luego, expresa que se debe ser aún más permisivo cuando se trata de la aprobación de resoluciones concurrentes, pues la Constitución no dispuso limitaciones para ello. Al hacerlo, olvida que el camino para enmendar la Constitu-ción requiere mayor rigor en cada uno de sus pasos([26]) La opinión mayoritaria asevera que, cuando se trata de reso-luciones concurrentes, no estamos ante leyes ordinarias. Cierto es. Precisamente por lo extraordinaria que es la Re-solución 35 es que este Tribunal tiene que ser más estricto al velar por que los cuerpos legislativos hayan llevado a cabo sus procesos responsablemente.
La opinión mayoritaria describe el proceso legislativo como “complejo, frustrante y, francamente, difícil de *88 comprender .. ,”.([27]) Acto seguido, indica que ello “no nece-sariamente se traduce a que con cada traspié legislativo se incurra en fallas constitucionales’’([28]) Me preocupa seria-mente que se describan violaciones al proceso constitucio-nal para enmendar la Ley Suprema como un mero “traspié”. De esa forma, se trivializa el proceso constitucio-nal, excusando la falta de rigurosidad legislativa, con la consecuencia de que la Constitución se debilita. No es de-ber de este Tribunal justificar los errores constitucionales de las demás ramas de gobierno. Por el contrario, nuestro deber es identificarlos, atenderlos y resolverlos de manera que la Constitución salga fortalecida.
Cuando se inicia un procedimiento para enmendar la Constitución es cuando ésta es más vulnerable. Por lo tanto, debemos ser más exigentes con el proceso empleado. Si no respetamos y fortalecemos los requisitos procesales adoptados para enmendar la Ley Suprema, dando signifi-cado y contenido real a su diseño de forma que no pueda ser alterada como resultado de un conjunto de sucesos torpe, viciado y desordenado como el de autos, la Constitu-ción se convierte en un documento frágil, pasivo y maleable de acuerdo con las pasiones momentáneas. Así no se forta-lece la democracia.
El contexto en el que surge este caso ilustra lo peligroso que es encontrar en el silencio el fundamento para no ser rigurosos. Por eso, hay una expresión de la opinión mayo-ritaria de la que tengo que hacerme eco, mas la pronuncio con una intención diferente: “Nuestro documento constitu-cional merece mayor respeto”. ([29])
*89 — O —

(1) Ya me había expresado en esa dirección en cuanto a los poderes de este Tribunal. Hoy lo hago nuevamente en cuanto a los poderes de la Asamblea Legisla-tiva: “Todo poder, incluyendo el del Tribunal Supremo, tiene límites”. In re Aprob. Rs. y Com. Esp. Ind., 184 D.P.R. 575, 635 (2012), opinión disidente de la Jueza Asociada Señora Fiol Matta. En ese sentido, se trata de una divergencia fundamental de visión sobre el origen y el uso del poder en nuestro ordenamiento constitucional. La necesidad de limitar el poder aplica con igual fuerza a todas las ramas de gobierno. Hoy nos corresponde identificar las fronteras del Poder Legislativo para iniciar un proceso que alteraría nuestra Ley Suprema teniendo en mente que “[c]uando a la autoridad representativa no se le imponen límites, los representantes del pueblo no son ya defensores de la libertad, sino candidatos a la tiranía”. B. de Jouvenel, El poder: historia natural de su crecimiento, Madrid, Ed. Nacional, 1956, pág. 335, citando a Benjamin Constant.

(2) íd., pág. 332, citando a Cicerón en La República, III, XVII.

(3) Opinión del Tribunal, pág. 17.

(4) Según González Casanon, una constitución, “inevitablemente, condiciona la acción de los gobernantes, limita su poder y expresa los poderes o derechos de los miembros de la comunidad”. J.A. González Casanon, Teoría del Estado y derecho constitucional, 2da ed., Barcelona, Ed. Vivens, pág. 193. Según el autor, la función de la constitución es “regular la organización de las diversas instituciones u órganos del Estado, asignando a cada una las competencias pertinentes y fijando tanto las rela-ciones fundamentales que deben producirse entre ellas como el procedimiento que éstas normalmente han de seguir en las mismas”. Id., págs. 217-218. Como mani-festamos en Fuster v. Buso, 102 D.P.R. 327, 345 (1974): “En la Edad Media cobra preeminencia la noción del constitucionalismo. Aunque, desde luego, el contenido de ese concepto se ha desarrollado considerablemente a través de los siglos, su idea central sigue siendo la misma. Esta es que el gobernante, o el gobierno, no son absolutos, sino que su poder tiene límites, está limitado”. De forma semejante, González Casanon expresa que “el Derecho Constitucional [es] el conjunto de normas jurídicas, fundamentales y principales, organizadoras de la sociedad estatal, siste-matizadoras de sus instituciones, limitadoras de la discrecionalidad y arbitrariedad de los gobernantes, garantizadoras de los derechos y libertades de los ciudadanos y orientadoras y directoras de la Política del Estado’’. (Enfasis suplido). González Casanon, op. cit., pág. 193. Véase, además, C.H. McIlwain, Constitutionalism: Ancient & Modern, Cornell University Press, 1947, pág. 9: “That it defines the authority which the people commits to its government, and in doing so thereby limits it. That any exercise of authority beyond these limits by any government is an exercise of power without right”.

(5) No podemos perder de perspectiva que no estamos ante el ejercicio de la Asamblea Legislativa de una facultad dentro de su poder de razón de Estado. De ser ese el caso, nuestra intervención se limitaría a revisar si se vulneró algún derecho constitucional de la ciudadanía. Pero, incluso en esas circunstancias, el poder guber-namental tiene límites inherentes. Culebra Enterprises Corp. v. E.L.A., 143 D.P.R. 935, 970-971 (1997), opinión concurrente y disidente del Juez Asociado Señor Hernández Denton. Por otro lado, en Pueblo v. Díaz, 160 D.P.R. 1 (2003), resolvimos e interpretamos que el principio de legalidad, como manifestación del debido proceso de ley constitucional, a pesar de no estar expresamente en el texto constitucional, era un “ideal adoptado por nuestra sociedad como parte de nuestros valores democráti-cos”, por lo que “constituye un límite al Poder Legislativo en la formulación de polí-tica pública al aprobar estatutos penales”. (Énfasis suplido). íd., pág. 27.

(6) (Énfasis suplido). 137 D.P.R. 195, 201 (1994).

(7) Opinión del Tribunal, pág. 31.

(8) Íd.

(9) (Énfasis suprimido). íd., págs. 31-32. A propósito de la expresión “padres de la Constitución”, no debemos olvidar que nuestra Ley Suprema también tuvo una madre, la delegada María Libertad Gómez. Por otro lado, para una argumentación *82 sobre la existencia del requisito de tramitar las resoluciones concurrentes de la misma forma que los proyectos de ley, en la Constitución y el Reglamento del Senado, véase la Opinión disidente del Juez Presidente Señor Hernández Denton, págs. 62-66.

(10) Aunque me uno a la opinión disidente del Juez Presidente Hernández Den-ton en cuanto al aspecto de la aprobación de la Resolución 35 mediante la votación por la Resolución 60, entiendo meritorio mencionar en esta ponencia que la supuesta voluntad de dos terceras partes de los miembros de la Asamblea Legislativa de apro-bar el contenido de la Resolución 35 cuando votaron por la Resolución 60 viene del mismo lugar que la opinión mayoritaria dice que vendrían los requisitos de trámite para aprobación de una resolución concurrente: “de la nada”. Véase Opinión del Tribunal, pág. 34. Reiterar en una resolución posterior lo que se expresó en una resolución que no fue aprobada válidamente- no puede tener el efecto de aprobar retroactivamente la resolución que no obtuvo los votos, menos aun cuando, al votar por la segunda resolución, se estaba considerando un proyecto desvinculado del primero. Votar por la Resolución 60 no conllevó volver a votar por la Resolución 35. La única frase de toda la Resolución 60 que mencionó la Resolución 35 constituye tan solo una expresión, no la voluntad de la Asamblea Legislativa debidamente aprobada. La opinión mayoritaria concluye lo contrario y se refiere a su interpreta-ción como un “hecho” que “{n]ingún juez de este Tribunal puede controvertir ...”. (Énfasis en el original). Opinión del Tribunal, pág. 30. ¡Claro que hay hechos que son incontrovertibles! Uno es que la Resolución 60 obtuvo los votos requeridos y la Re-solución 35 no. Sin embargo, no hay tal certeza sobre si la Resolución 35 fue apro-bada por referencia a través de la votación de la Resolución 60. Si no hubiese habido duda sobre esta controversia, este Tribunal no habría expedido el presente recurso, no lo habría atendido mediante una certificación intrajurisdiccional y no habría ce-lebrado una vista oral para analizar a fondo los argumentos a favor y en contra.

(11) Opinión del Tribunal, pág. 41.

(12) (Énfasis en el original). Íd., págs. 40 y 41.

(13) Íd., pág. 15.

(14) Íd., págs. 38-39.

(15) Íd., págs. 42—43.

(16) Íd., pág. 43.

(17) A diferencia de los poderes de razón de Estado, el poder de la Asamblea Legislativa para iniciar un proceso de enmienda constitucional no es inherente. Por el contrario, es el producto de una autorización expresa de la propia Constitución. Por lo tanto, es fundamental que la Asamblea Legislativa cumpla cabalmente con las exigencias procesales y sustantivas que la Constitución exige como parte de un pro-ceso de enmiendas. Según González Casanon, “[l]as constituciones ... tienen un ori-gen; un contenido; un procedimiento de elaboración; aprobación y puesta en vigor; una aplicación y práctica; unos mecanismos de conservación y defensa', unas muta-ciones y un sistema de reforma y derogación”. (Énfasis suplido). González Casanon, op. cit., pág. 209. En ese sentido, “[a]sí como la Constitución prevé su propia reforma ... también la Constitución suele prever su defensa jurídica". (Énfasis suplido). Id., pág. 226. Como manifestación de esos mecanismos de conservación y defensa, “la reforma constitucional desborda el mero trámite procedimentaf para convertirse en un problema básico de poder constituyente y de soberanía”. (Énfasis suplido). Id., pág. 218. Como explica Colón-Ríos, “[e]s un principio básico de todo ordenamiento jurídico que el poder de enmendar una constitución se encuentra sujeto a diversos tipos de límites. (Los más comunes, por supuesto, son de tipo procesal)”. J. Colón-Ríos, ¿Pueden haber enmiendas constitucionales inconstitucionales?, 42 Rev. Jur. U.I.P.R. 207, 209 (2008).

(18) “gn nuestro sistema constitucional de gobierno compuesto por tres (3) po-deres igualmente subordinados a la soberanía del Pueblo, el Poder Judicial es el llamado a administrar la justicia, es decir, a obtener que las normas jurídicas se cumplan en aquellos casos en que han sido violadas o menoscabadas. En virtud de esa función, es al Poder Judicial a quien le corresponde definir los límites del ejerci-cio de los demás poderes. Por ello, es obligación exclusiva del Tribunal Supremo ser *85 el intérprete final de la Constitución”. (Énfasis suplido). Berríos Martínez v. Gobernador II, 137 D.P.R. 195, 240 (1994), opinión de conformidad del Juez Presidente Señor Andréu García.

(19) 118 D.P.R. 45, 55 (1986).

(20) En ese sentido, el deber de este Tribunal de interpretar la Constitución, como parte de la revisión judicial, tiene su génesis en la separación de poderes, nuevamente, como contrapeso al exceso por parte de las ramas políticas. “La sepa-ración de poderes sirve para mantener el equilibrio entre las tres ramas de Gobierno con el fin de evitar que se ponga en peligro el sistema democrático, concentrando demasiadas facultades en una de éstas.... El desequilibrio se produce tanto cuando una rama le arrebata facultades a otra como cuando una de ellas cede sus poderes a otra. Cuando eso sucede, se rompe el balance y es difícil volver a estabilizarlo”. (Escolios omitidos). In re Aprob. y Com. Esp. Ind., supra, pág. 647, opinión disidente de la Jueza Asociada Señora Fiol Matta.

(21) Opinión del Tribunal, págs. 5 y 9. Ante un aparente silencio constitucional, no sigue automáticamente que la actuación gubernamental está permitida. De eso consiste, precisamente, nuestra labor interpretativa. “Al interpretar una disposición *86 constitucionalno podemos caer en la tentación de limitar nuestros esfuerzos a un análisis superficial. Los conceptos constitucionales no son palabras adoptadas ca-sualmente; son parte de un diseño delicado, cuyo fin es evitar lo que hoy se ha materializado: la concentración del poder”. In re Aprob. y Com. Esp. Ind., supra, pág. 638, opinión disidente de la Jueza Asociada Señor Fiol Matta.

(22) Opinión del Tribunal, pág. 17.

(23) Íd„ pág. 18.

(24) Íd.

(25) Íd., págs. 32-34. Existe un amplio consenso en que el proceso para enmen-dar una Constitución debe ser más exigente que el utilizado para aprobar una ley ordinaria: “La gran mayoría de las constituciones escritas establecen una serie de requisitos que hacen la modificación de la constitución más difícil que la adopción de leyes ordinarias”. (Énfasis suplido). Colón-Ríos, supra, pág. 209. “Los llamados pro-cedimientos agravados constituyen el conjunto de trámites, más o menos complejos o difíciles, con los que se pretende que el poder legislativo ordinario lleve a cabo una tarea, parcial o totalmente constituyente, como es la revisión de la Constitución mediante reforma. Tales procedimientos son de lo más variado y todos ellos buscan, como decimos, el máximo consenso, expresado comúnmente por: la mayoría cualifi-cada de votos favorables a la reforma; la participación de ambas cámaras (en los sistemas bicamerales) [entre otros]”. (Énfasis suplido). González Castanon, op. cit, pág. 220.

(26) Es norma universal en el constitucionalismo moderno que no debe ser fácil enmendar una Constitución. Por lo tanto, se debe cumplir rigurosamente con el proceso para enmendarla.

(27) Opinión del Tribunal, pág. 47.

(28) (Énfasis suplido). íd.

(29) Íd., pág. 16.